Fifth Division

September 30, 2004

No. 1-01-4112

THE PEOPLE OF THE STATE OF ILLINOIS,

          Plaintiff-Appellee,

          v.

MICHAEL THORNE,

          

          Defendant-Appellant.

)

)

)

)

)

)))

)

)

)

Appeal from the

Circuit Court of

Cook County.

No. 99 CR 25682

Honorable

Leo E. Holt,

Judge Presiding.

JUSTICE NEVILLE delivered the opinion of the court:

Defendant Michael Thorne, along with codefendants Harvey Robinson, James Powell, and Donnell Smith, was charged with one count of armed robbery and one count of aggravated robbery based on an incident that occurred on November 1, 1999.  Prior to trial, Thorne filed a motion to quash arrest and suppress evidence, which the trial court denied.  Following a bench trial, at which Thorne was tried simultaneously with but separately from Robinson and Powell, the trial court found Thorne guilty of armed robbery and sentenced him to six years in the Illinois Department of Corrections.  Thorne now appeals, presenting the following issues for our review: (1) whether the State established beyond a reasonable doubt that the defendant used a dangerous weapon while committing a robbery thereby violating the armed robbery statute when there was no evidence that the weapon, a BB gun, was used in a dangerous manner; (2) whether the trial court erred in admitting the victim's prior identification of Thorne, including testimony as to the role Thorne played in the robbery, as substantive evidence; and (3) whether the trial court improperly relied on a nontestifying codefendant's statement in finding Thorne guilty of armed robbery.

BACKGROUND

Alberto Acevedo, the victim, testified that at 10:30 a.m. on November 1, 1999, he was selling food from his catering truck, which was parked on the west side of Sacramento Street near Franklin Boulevard facing southbound, when he was approached by four black individuals.  Acevedo testified that one of the men grabbed him from behind and put a gun on his back.  Acevedo also testified that the individual pointed the gun to his head.  The individual with the gun demanded money while two of the men searched his pockets.  One of the men found and removed $235 from his right pocket.  Acevedo described the man who took the money as having braided hair.  Acevedo described the man who pointed the gun at him as being a little bit taller than himself and as having short hair and a short beard.  Acevedo described the other man who went through his pockets as having a hairstyle like "a ball or something sticking out."  Acevedo testified that during the time the two men were going through his pockets and the third man was pointing the gun, the fourth individual was standing about 45 feet away and "looking to the sides, all around."

After the robbery, Acevedo testified the four men ran away across Franklin Boulevard.  Acevedo got in his truck and drove after them, traveling southbound on Sacramento.  Acevedo testified that prior to the arrival of the police, he observed two of the offenders enter a station wagon and remove their jackets. 
From his truck, which was now facing west on Franklin, Acevedo watched the men enter a building on the right side of Franklin and go up the stairs.  Acevedo flagged down a Metra repair truck, told the Metra employee he had been robbed, and asked him to call the police.   Acevedo did not see anyone exit the building while he was waiting for the police.  

When the police arrived about 10 minutes later, Acevedo directed them to the door of the building that  he observed the offenders enter.  Acevedo testified that he remained in his truck while the police went into the building.  Sometime later, the police told Acevedo that "they had located them [and they wanted him] to go with them and identify them."  Acevedo accompanied the police to an apartment on the second floor of the building and he was shown "about eight persons."  Acevedo testified that the eight people were black, the "majority of them were males," and "[t]hey were no older than thirty years of age."  Acevedo identified four of the men as the men who robbed him.  Acevedo testified that he was questioned about whether the four men he had identified appeared as they were when they robbed him.  Acevedo responded "no[,] because some of them had taken their jackets off."  He stated that when he identified them at the scene, he "recognize[d] them very well."  Acevedo stated he was shown two jackets by the police officers while he was waiting in his truck, one was black and one was black and green.  Acevedo testified that he identified Thorne as the person who wore the black jacket during the robbery.  After identifying Thorne at trial as being the man who wore the black jacket, Acevedo stated, "I’m not too sure right now because I really don’t remember their faces very well now and the clothing that they had on then.  But at that moment, yes, I was able to identify them."   

Acevedo testified that the person with the gun was wearing a black sweatshirt with a hood or cap on.  When asked what the other two men were wearing, Acevedo testified that he "identified them [the] way their faces looked and the way their hairstyles were."  Acevedo testified that the man with the braids was "the one who was trying to get the money out of me."  Acevedo could not say specifically who took the money.  He stated: "It was the one with the gun and the two that had that special hairstyle."  Acevedo stated that of the four people he identified, two of them had removed their jackets and one of them had changed his pants, but he recognized them by their faces and hair.  He stated that the one who had changed his pants was the one who had held the gun to his head.  He testified that, after identifying the men, he was told by the police to return to his truck and wait.  Acevedo waited and then an officer approached his truck and showed him a gun and asked him if he recognized it.  Acevedo identified it as a black pistol and stated he had seen the gun before when it was put to his head.

In court, Acevedo identified Thorne, Robinson, and Powell as being three of the four offenders.  Acevedo testified that when he originally identified the men he told the police officers the role each man played in the robbery.  At that time, he was able to recognize two of the men by their hairstyles, noting that one had braids and the other had hair in "little cups."  He said that he recognized them because they were in front of him for about two to three minutes.  He stated he did not lose sight of them until they entered the door of the building.  With respect to the two men who Acevedo saw go to the station wagon, he testified that they ran into the building and then, "almost at the same time," came out.     

Acevedo was asked if the three men he identified in court looked different from how they looked when he identified them on the day of the robbery.  Acevedo stated that their dress and hairstyles were different but their faces were the same.  Acevedo identified the three men in "the uniform from the prison" as the men who robbed him.  The three men in the prison uniforms were identified as Thorne, Powell and Robinson.  Acevedo further stated "[t]here is one that is not here that he was away from the three of them."

Officer Glen Szeszol testified that on the morning of November 1, 1999, he responded to an armed robbery call at 3000 West Franklin.  When he arrived at the location, he saw Officer Fred Estrella and Officer Hector Romero speaking in Spanish with Acevedo.  After the conversation with Acevedo ended, Officer Szeszol went to the second floor of a building located just east of them.  Officer Szeszol was accompanied by his partner and by Officer Romero, Officer Estrella, and Acevedo.  Officer Szeszol described the building as a two-story housing development with an exposed porch on the second story.  All the apartments were boarded up and vacant with the exception of apartment 201.  Officer Szeszol approached the opened door of apartment 201 and saw four black males sitting on chairs and couches.  He identified Thorne, Robinson and Powell as three of the four men that he saw in the apartment.  Officer Romero had a conversation in Spanish with Acevedo, who was pointing in the apartment, and then informed Officer Szeszol that the men in the apartment were the offenders.  The men were asked to step into the hallway, where they were searched, handcuffed, and taken downstairs.  

Officer Romero asked the woman in the apartment if she was the leaseholder.  She said she was and signed a consent to search the apartment.  Officer Szeszol began his search of the apartment in the kitchen area.  He searched the garbage and found a black and green sweatshirt wrapped around a "hard object" that he identified as a Marksman .177-caliber black BB gun.  Officer Szeszol, along with Officer Romero, brought the gun and the sweatshirt downstairs to show them to Acevedo.  Officer Romero then had a conversation with Acevedo in Spanish.

Officer Fred Estrella testified that he arrived on the scene along with his partner, Officer Romero, and spoke with Acevedo.  After speaking with Acevedo, Officer Estrella, along with Acevedo and the other officers on the scene, walked into a building and went to the second floor, where they walked down a corridor to the one open door.  Officer Estrella looked inside and saw people in the apartment.  Acevedo was asked in Spanish if the people in the apartment were the men who robbed him and he responded that they were.  Officer Estrella was shown Chicago police department "C.B." reports containing individual photographs (People's exhibits 1 through 4) and asked to identify the person in each photograph.  Officer Estrella identified People's exhibit 1 as a Chicago police department "C.B." report that contains a picture of Robinson, and he stated that the photograph accurately depicts how Robinson appeared when Acevedo identified him.  When asked to identify Robinson in court, Officer Estrella incorrectly identified Powell and then stated, "It's the haircut that's throwing me off."  Officer Estrella identified People's exhibit 2 as a Chicago police department "C.B." report that contains a picture of Smith, and he stated that the photograph of Smith accurately depicts how Smith appeared when Acevedo identified him.  Officer Estrella identified People's exhibit 3 as a Chicago police department "C.B." report that contains a picture of Powell, and he stated that the photograph of Powell accurately depicts how Powell appeared when Acevedo identified him.  Officer Estrella identified Powell in court.  Officer Estrella identified People's exhibit 4 as a Chicago police department "C.B." report that contains a picture of Thorne, and he stated that the photograph of Thorne accurately depicts how Thorne appeared when Acevedo identified him.  Officer Estrella identified Thorne in court and stated that Thorne's haircut was shorter in court than it was on November 1, 1999, at which time it was "more centered and standing up."  Officer Estrella stated that to the best of his knowledge, the four pictures contained in People's exhibits 1 through 4 were taken on November 1, 1999.

Officer Estrella testified that after the men identified by Acevedo were arrested, a woman in the apartment signed a consent to search.  Officer Estrella searched a back bedroom and found $235 rolled up in blue sweatpants in the bedroom.

Officer Hector Romero testified that on the morning of November 1, 1999, he and his partner, Officer Estrella, responded to a robbery call at Sacremento and Franklin.  When they arrived at the scene, he spoke with the victim, Acevedo, in Spanish.  After speaking with Acevedo, Acevedo guided him and other officers who had arrived on the scene to the building where he saw the offenders flee.  After they arrived at the building, they went up a stairwell to the second floor.  Officer Romero testified that most of the building was boarded up.  They approached the one occupied apartment, looked through the open door, and saw four black males and one black female.  Acevedo told him that those were the men who robbed him.  The men were asked to step out of the apartment.  As each man exited the apartment, Acevedo told Officer Romero the role each played in the robbery.

At this point during the testimony, Robinson’s counsel objected to the testimony on hearsay grounds.  After extensive argument as to the admissibility of the testimony pursuant to section 115-12 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-12 (West 1998)), the court overruled the objection.  Officer Romero went on to explain that the victim had identified Robinson as the man who displayed the weapon and said "Give me your money." Acevedo identified Thorne as the man who held him and Smith as the man who searched his pockets.  Acevedo identified Powell as the lookout.  

Officer Romero testified that after the men were placed in custody, the officers searched the apartment where they were found.  Officer Szeszol showed him a BB gun and a sweatshirt.  Officer Romero also saw Officer Estrella exit the building with a "bundle of U.S.C."  When Acevedo was shown the gun, he identified it as the gun used during the robbery.  He also identified the money as the money he was missing.

Detective Carl Loeffler testified that on November 1, 1999, he had a conversation with  his partner, Detective Jim Kruger, and Thorne
.  Thorne was advised of his 
Miranda
 rights prior to speaking with Detective Loeffler.  Thorne told Detective Loeffler that earlier that day, he and Powell were walking along 16th Street near Springfield Street when Tookey, a friend of theirs, drove up to them in a brown station wagon.  Detective Loeffler stated that person was Robinson.  Robinson sat in the driver's seat and a person unknown to Thorne sat in the passenger's seat.  According to Thorne, Robinson asked him to come with them to his grandmother's house.  Thorne and Powell got in the backseat and they drove to the area around Franklin and Albany where Robinson's grandmother lived.  They exited the car and observed the victim's catering truck down the street at Sacramento and Franklin.  All four men walked toward the truck.  According to Thorne's statement, when they got there, Robinson pulled out a gun and Smith, the unknown black male in the passenger seat, went through the victim's pockets and took some money.  After robbing the victim, all four men ran back to Robinson's grandmother's apartment, where Robinson told them he had taken about $234 from the victim and wrapped the gun in a sweatshirt and hid it in the apartment.  

Detective Loeffler testified that later that day, he and his partner, Detective Kruger, had a conversation with Powell after advising him of his
 Miranda 
rights.  Powell told them that earlier that day, he and his friend, Thorne, were walking on 16th Street near Springfield when a car driven by Tookey pulled up with an unknown black male in the passenger seat.  Tookey, also known as Robinson, asked them to help move some furniture at his grandmother’s house so they got in the car.  They went to his aunt’s house looking for Powell’s cousin, but he was not there.  They next went to a Foot Locker store because Robinson wanted to buy something but he did not buy anything.  After leaving Foot Locker, they drove to Franklin Boulevard, where Robinson’s grandmother lived.  They got out of the car and saw Acevedo’s catering truck down by Sacramento and Franklin.  The four of them walked toward the truck and Robinson produced a handgun.  Smith went through Acevedo’s pockets and removed some money.  Then all four of them ran to Robinson’s grandmother’s house.  He did not know how much money Smith removed from Acevedo’s pockets; he only knew that Robinson hid the gun somewhere in the kitchen.

Detective Loeffler also testified that sometime during the afternoon of November 1, 1999, Acevedo was shown the recovered handgun, which he identified as the weapon used during the robbery, and the black and green sweatshirt.

On cross-examination, Detective Loeffler testified that Thorne’s statement was never reduced to writing for Thorne’s signature and that an assistant State’s Attorney was not present for the statement.  Detective Loeffler’s partner prepared a report regarding the investigation which he reviewed and signed.  In a following supplemental report, it does not state that Thorne approached the truck.

At the close of evidence, Thorne moved for a judgment of acquittal.  Thorne argued that the State failed to prove that the BB gun used during the robbery was a dangerous weapon and that the State failed to establish Thorne committed the crime because the victim could not identify him in court.  The trial court denied the motion and found Thorne guilty of armed robbery.  Thorne filed a motion for a new trial where he reiterated his arguments set forth in his motion for acquittal.  The trial court denied Thorne's motion for a new trial and sentenced Thorne to six years in the Illinois Department of Corrections.  Thorne now appeals.

ANALYSIS

THE SUFFICIENCY OF THE EVIDENCE

Thorne's first argument on appeal is that his conviction for armed robbery should be reduced to robbery because the BB gun used in the robbery was not, as a matter of law, a dangerous weapon for purposes of the armed robbery statute.  Specifically, Thorne argues that the evidence at trial shows only that the gun was a BB gun and looked like a black pistol and that the State failed to prove the weapon was dangerous by its description, the manner of its use, or the circumstances of the case.

A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt.  
People v. Collins
, 106 Ill. 2d 237, 261 (1985).  When presented with a challenge to the sufficiency of the evidence, a reviewing court will sustain a criminal conviction if "'after viewing the evidence in the light most favorable to the prosecution, 
any
 rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (Emphasis in original.)  
Collins
, 106 Ill. 2d at 261, quoting 
Jackson v. Virginia
, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573 99 S. Ct. 2781, 2789 (1979).

A person commits the offense of armed robbery when he or she commits robbery (720 ILCS 5/18-1 (West 1998)) "while he or she carries on or about his or her person, or is otherwise armed with a dangerous weapon." ( 720 ILCS 5/18-2(a) (West 1998)).
(footnote: 1)  "The purpose of the armed robbery statute is to treat more severely a person who commits a robbery while possessing a weapon actually capable of causing serious injury than a person who commits a robbery without possessing such a weapon."  
People v. Lindsay
, 263 Ill. App. 3d 523, 527-28 (1994), citing 
People v. Skelton
, 83 Ill. 2d 58 (1980).

While a definition of the term "dangerous weapon" cannot be found in the armed robbery statute, our courts have defined the term by dividing objects alleged to be "dangerous weapons" into four categories. 
Lindsay
, 263 Ill. App. 3d at 528.  The first category consists of objects that are dangerous 
per se
, such as knives and loaded guns.  See 
People v. Neither
, 166 Ill. App. 3d 896, 900 (1988).  The second category consists of objects that are never dangerous weapons, such as a four-inch plastic toy gun.  See 
Skelton
, 83 Ill.2d at 66-67.  The third category consists of objects that are not necessarily dangerous weapons but can be used as such, for instance, an unloaded gun or a toy gun made of heavy material, which are incapable of shooting bullets but can be used as a bludgeon (see 
People v. Bayless
, 99 Ill. App. 3d 532, 538 (1981)) or, as another example, fingernail clippers with a sharpened file (see 
People v. Robinson
, 73 Ill. 2d 192, 201-02 (1978)).  The fourth category consists of objects that are not necessarily dangerous but were actually used in a dangerous manner in the course of the robbery.  See 
People v. De La Fuente
, 92 Ill. App. 3d 525, 535-36 (1981) (starter pistol actually used to bludgeon the victim found to be dangerous 
per se 
because of the manner in which it was used
: the victim was struck on the head).  While it is generally a question of fact whether the object at issue was "sufficiently susceptible to use in a manner likely to cause serious injury to qualify as a dangerous weapon," the question becomes one of law where "the character of the weapon is such as to admit of only one conclusion."  
Skelton
, 83 Ill. 2d at 66.

Thorne relies on 
People v. Davis
, 199 Ill. 2d 130 (2002), and argues that a BB gun is not a dangerous weapon 
per se
 and, therefore, the State was required to present evidence that would enable a trier of fact to conclude that the gun was or could have been used in a way to constitute a dangerous weapon.  Thorne's reliance on 
Davis
 is misplaced.  A close examination of the 
Davis
 case reveals that it does not involve the armed robbery statute at issue herein; rather, at issue in 
Davis
 was whether a pellet or BB gun qualified as a dangerous weapon within the meaning of the armed violence statute.  
Davis
, 199 Ill. 2d at 132-33.  Unlike the armed robbery statute where the term "dangerous weapon" is not defined, the armed violence statute expressly defines the term.  
Davis
, 199 Ill. 2d at 132-33.  

In determining whether a BB gun qualifies as a dangerous weapon under the armed violence statute, the 
Davis
 court carefully examined the statutory definition.  The court noted that the armed violence statute specifically names several weapons as qualifying as a Category I weapon: "pistol, revolver, rifle, shotgun, spring gun, sawed-off shotgun, stun gun or taser, knife with a blade of at least three inches in length, dagger, dirk, switchblade knife, and stiletto."  
Davis
, 199 Ill. 2d at 136.  In addition to individually naming certain weapons, the provision also uses two inclusive clauses: "any other firearm" and "any other deadly or dangerous weapon or instrument of like nature."  
Davis
, 199 Ill. 2d at 136.  The court held that a BB gun did not qualify as "any other firearm" under the armed violence statute by looking to the Firearm Owners Identification Card Act (430 ILCS 65/1.1 (West 2000)) and the Air Rifle Act (720 ILCS 535/0.01 (West 2000)).  
Davis
, 199 Ill. 2d at 136-37.  The court also held that a BB gun did not fall within the purview of the phrase "any other deadly or dangerous weapon or instrument of like nature" in the armed violence statute.  The court applied the doctrine of 
ejusdem generis
 in conjunction with the last antecedent rule and found that the statutory phrase "'any other deadly or dangerous weapon or instrument of like nature' was intended to refer only to weapons or instruments 'such like' the class of blade-type weapons which immediately preceded the clause in the provision."  
Davis
, 199 Ill. 2d at 138-39.  After concluding that a BB gun did not qualify as a dangerous weapon under the armed violence statute, the court pointed with approval to several armed robbery cases in which a BB gun qualified as a dangerous weapon, remarking that "[i]n none of these cases were defendants ever charged with armed violence."  
Davis
, 199 Ill. 2d at 139-40.  Thus, 
Davis
 makes clear that its holding was limited to the armed violence statute and its construction of words in that statute should not be used to construe the words in the armed robbery statute.  
Davis
, 199 Ill. 2d at 139-40.

The issue in this case, unlike the issue in 
Davis
, is whether the BB gun used in the robbery qualifies as a dangerous weapon within the purview of the armed robbery statute.  In light of the fact there was no evidence that the BB gun was loaded or that it was in fact used in a dangerous manner during the robbery, it falls within the third category of objects described by the courts as objects that can be used as a dangerous weapon.  See 
Lindsay
, 263 Ill. App. 3d at 528 (unloaded guns fall into third category of objects and qualify as dangerous weapons since they are incapable of shooting bullets but can be used as bludgeons).  Therefore, whether the BB gun is a dangerous weapon is a question of fact to be resolved by the trier of fact.  See 
Lindsay
, 263 Ill. App. 3d at 528; 
People v. Flores
, 245 Ill. App. 3d 149, 158 (1993) (whether an object in the third category is a dangerous weapon is a question of fact to be resolved by the trier of fact.)

In all the cases that have found guns that are incapable of firing bullets to be dangerous weapons under the armed robbery statute, there was either evidence (1) that the gun was actually used in a dangerous manner, or (2) that the character of the weapon was such that it could conceivably be used as a bludgeon.  See 
De La Fuente
, 92 Ill. App. 3d at 536 (starter pistol that was actually used as a bludgeon was per se a dangerous weapon for purposes of armed robbery statute); 
Bayless
, 99 Ill. App. 3d at 537 (toy cap gun could have been used as a bludgeon to inflict serious harm due to its weight and metallic nature); 
People v. Greer
, 53 Ill. App. 3d 675, 683 (1977) (because unloaded pellet gun was made of metal, it could have been used as a bludgeon and whether the gun was a dangerous weapon was a question of fact for the jury); 
People v. Hill
, 47 Ill. App. 3d 976, 978 (1977) (because unloaded air pistol was a "piece of metal," it could have been used "in a manner dangerous to the physical well-being of the individual threatened" and, thus, the trier of fact was justified in finding it was a dangerous weapon); 
People v. Ratliff
, 22 Ill. App. 3d 106, 108 (1974) (.22-caliber pistol designed to fire blank cartridges was a piece of metal and could have been used "in a manner dangerous to the physical well-being of the individual threatened," thus, the jury was justified in finding that it was a dangerous weapon).  In every case finding that an unloaded gun could have been used as a bludgeon and, therefore, could be considered a dangerous weapon, there was evidence presented as to the physical characteristics (weight or metallic nature) of the weapon.  Here, the State failed to present such evidence.  The only testimony in the instant case that goes to the physical characteristics of the gun was Officer Szeszol's testimony that when he searched the garbage in the apartment he saw a black and green sweatshirt and "upon removing it [he] could feel there was a hard object inside of it."  He later stated the hard object was a Marksman .177-caliber black BB gun.  The victim described the weapon only as a "black pistol."  There was no evidence presented that the BB gun was a heavy metal object from which it could be inferred that it was capable of being used as a bludgeon.  The officer's description of the weapon as a "hard object" and as a Marksman .177-caliber black BB gun is insufficient circumstantial evidence to support a finding that the weapon could have been used as a bludgeon.  See 
Skelton
, 83 Ill. 2d at 66-67 (revolver constructed of plastic not a dangerous weapon under the armed robbery statute).  The State did not introduce the gun into evidence and provided no pictures for the trial court. 
The case law makes it clear that in order for the State to meet its burden of proof beyond a reasonable doubt (1) there must be testimony as to the physical characteristics of the gun which could make it dangerous, specifically testimony as to the gun's weight or metallic nature; or (2) there must be testimony that the gun was used in a dangerous manner: the gun was used as a bludgeon or club. See, 
e.g., Skelton
, 83 Ill. 2d at 61-67.  Without some additional evidence as to the BB gun's weight, its physical characteristics (metal), and the dangerous manner in which it was used, we cannot come to the conclusion beyond a reasonable doubt, based on testimony that the BB gun was a "hard object," that the BB gun in this case is a dangerous weapon.  See 
Skelton
, 83 Ill. 2d at 64-67.

After reviewing Illinois case law on dangerous weapons and after reviewing the evidence in the light most favorable to the prosecution, we find that the evidence was insufficient to support a finding that the weapon used during the robbery was a dangerous weapon (1) because there was no testimony that the BB gun was used as a bludgeon or club, and (2) because there was no testimony as to  the BB gun's weight or metallic nature to support a finding that the BB gun could have been used in a dangerous manner.  
Skelton
, 83 Ill 2d at 64-67. Additionally, the State did not introduce the gun into evidence and provided no pictures for the trial court to view the makeup of the gun.  Therefore, Thorne's conviction for armed robbery will be reversed and the cause remanded for the trial court to enter a judgment for robbery.

THE ADMISSION OF A DECLARANT'S PRIOR 

OUT OF COURT STATEMENT OF IDENTIFICATION

Next, Thorne argues that it was error for the trial court to allow Officer Romero to testify regarding Acevedo's prior identification of Thorne at the scene.  Thorne also argues that Officer Romero's testimony regarding Thorne's role in the robbery was improperly admitted as evidence because his testimony is inadmissible prior identification evidence under section 115-12 of the Code of Criminal
 Procedure of 1963, (725 ILCS 5/115-12 (West 1998)).  According to Thorne, identification "does not encompass statements detailing the various actions of the person being identified."    

Section 115-12 of the Code of Criminal
 Procedure makes it clear that testimony regarding a declarant's prior out-of-court statement of identification is not rendered inadmissible by the hearsay rule if: "(a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him."  725 ILCS 5/115-12 (West 1998); 
People v. Holveck
, 141 Ill. 2d 84, 105 (1990); 
People v. Bowen
, 298 Ill. App. 3d 829, 835-36 (1998).  

We first address the issue of the applicable standard of review.  Generally, this court reviews a trial court's evidentiary rulings under an abuse of discretion standard.  
People v. Childress
, 158 Ill. 2d 275, 296 (1994).  Thorne argues that the court should review the issue 
de novo
.  We agree.  An exception to the general rule of deference applies in cases that involve statutory interpretation.  See 
People v. Hall
, 195 Ill. 2d 1, 21 (2000).  In such a case, evidentiary rulings are given 
de novo
 review.  See 
Hall
, 195 Ill. 2d at 21; 
People v. Kinsloe
, 281 Ill. App.3d 799, 807-08 (1996) (court construed
 de novo
 the applicability of section 115-10.1 of the Code of Criminal Procedure, which allows for the admissibility of testimony of prior inconsistent statements, giving no deference to the trial court). The issue here is whether Acevedo's prior identification of the offenders is admissible under section 115-12.  Resolution of this issue does not involve discretionary factual findings.  The questions of whether the declarant testifies at the trial or hearing, whether the declarant is subject to cross-examination concerning the statement, and  whether the statement is one of identification of a person made after perceiving him do not involve fact-finding based on the demeanor or credibility of the witnesses.  See 
People v. Aguilar
, 265 Ill. App. 3d 105, 109 (1994) (court reviewed 
de novo
 the trial judge's application of the admissions exception to the rule against hearsay because application of the rule did not require the trial court to use its discretion regarding fact-finding or assessing the credibility of the witnesses).  Accordingly, we review the issue 
de novo.

We find that the trial court properly admitted the testimony of Officer Romero because all three requirements set out in the plain language of section 115-12 were met.  725 ILCS 5/115-12 (West 1998).  First, the victim testified at trial.  Second, the victim was subject to cross-examination concerning his statement.  Finally, the statement was one of identification made by the victim after perceiving the defendant.  

The case of 
People v. Bowen
, 298 Ill. App. 3d 829 (1998), supports our holding admitting the victim's prior out-of-court statement identifying Thorne.  In 
Bowen
, Maurice Bowen was charged with, 
inter alia
, first degree murder.  During the trial, a witness, Lamont Brown, testified that he witnessed a man named Maurice fire several shots at the victim, who later died.  
Bowen
, 298 Ill. App. 3d at 831.  Brown denied, however, that he identified the defendant, Maurice Bowen, as the murderer.  
Bowen
, 298 Ill. App. 3d at 832.  He admitted that he identified the defendant to the police, but stated that he only identified him as being a member of a rival gang.  
Bowen
, 298 Ill. App. 3d at 832.  A detective was allowed to testify that the witness, Brown, had provided a four-page statement of his account of the shooting and in fact identified defendant from a line-up "as the one who shot [the victim.]"  
Bowen
, 298 Ill. App. 3d at 833.  The defendant appealed and argued the detective's testimony was inadmissible based on section 115-12.  The 
Bowen
 court admitted the detective's testimony after it adopted section 611.16 of Cleary & Graham's Handbook of Illinois Evidence which states:

"[P]rovided the declarant testify at trial and be subject to cross-examination concerning the prior statement of identification of a person made after perceiving him, the prior statement of identification, testified to by the declarant or another witness, including a police officer, is now admissible as an exception to the hearsay rule as substantive evidence without regard to whether the statement of prior identification corroborates a positive in-court identification by the declarant, is offered as a substitute for an inability to make an in-court identification, or to bolster a weak in-court identification on the part of the declarant." M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 611.16 at 481 (6th ed.1994).

The 
Bowen
 court found that a witness's identification that occurred closer to the time of the crime should not be kept from the jury solely because the witness is unable to identify the defendant at the time of trial.  
Bowen
, 298 Ill. App. 3d at 835.

More importantly, 
Bowen
 refutes Thorne's argument that it was improper for the court to allow Officer Romero to testify as to the role each defendant played in the robbery.  In 
Bowen
, the detective testified that the witness identified the defendant "as the one who shot [the victim.]"  
Bowen
, 298 Ill. App. 3d at 833.  Here, Officer Romero testified that as the men were exiting the apartment, Acevedo told Officer Romero the role each played in the robbery.  We find that Acevedo was identifying Thorne with more specificity when he told the officer the role Thorne played during the robbery: Thorne was the man who held Acevedo during the robbery.

THE SHOWUP IDENTIFICATION

NEAR THE SCENE OF THE CRIME

Thorne also argues that Officer Romero's identification testimony should not be admitted because it was based on an unreliable prior identification.  According to Thorne, the prior identification was made under circumstances that were suggestive.  Specifically, Thorne asserts it was improper to inform the victim that the police had located the offenders.  According to the victim, after the police arrived, he waited in his car while they looked for the offenders.  The victim stated that the police eventually returned to his car and informed him that "they had located them" and they wanted to see if he could identify the offenders.  The victim stated that he went to the second floor of an apartment building where he viewed eight people, all of whom were black and no older than 30 years old.  According to the victim, from those eight people, he identified the four men who robbed him.  Officer Romero's testimony differed slightly from the victim's.  He stated that the victim guided him and the other officers to the building where, according to the victim, the offenders had fled, and then viewed eight people located inside, ultimately identifying the four offenders.

We do not believe that the identification procedure used in this case was unduly suggestive.  Illinois courts have long held that an immediate showup identification near the scene of the crime is proper police procedure. See 
People v. Lippert
, 89 Ill. 2d 171, 188 (1982); 
People v. McKinley
, 69 Ill. 2d 145, 152 (1977); 
People v. Manion
, 67 Ill. 2d 564, 570-71 (1977).  After reviewing the record, we find that Officer Romero did not identify the robbers when he told the victim "they had located them."  Officer Romero testified that Acevedo led the police to the building where the offenders fled and then went to the second floor with the police where he identified four men out of eight men found in an apartment.  The weight to be given to the testimony of the victim and Officer Romero is a question for the trier of fact.  
People v. Moore
, 266 Ill. App. 3d  791, 796 (1994).  In light of Illinois case law, we find that in this case, given the exigent circumstances, the police were in hot pursuit of the suspected perpetrators a short time after the robbery, the immediate showup identification near the scene of the crime was proper.  See, 
e.g., Lippert
, 89 Ill.2d at 188; 
McKinley
, 69 Ill. 2d at 152; 
Manion
, 67 Ill. 2d at 570-71. 

THE TRIAL COURT CONSIDERED THE EVIDENCE SEPARATELY AND INDEPENDENTLY AT THE JOINT TRIAL

Finally, Thorne argues that the trial court improperly relied on the incriminating statements made by Powell, a nontestifying codefendant, in finding him guilty.  Specifically, Thorne points to the following comments made by the judge:

"However bad Mr. Acevedo's observations were he was substantially correct not by what he said but by what the defendants themselves said, at least what Mr. Powell and Mr. Thorne said because they themselves place them at the scene of the crime.  A proposition which Mr. Acevedo could be incorrect about but doesn't appear to be incorrect when they themselves agree that they were there; and to be sure their conduct that they engaged in while they were there they contend was essentially, this is different from that which is attributable through them, but the attribution of their conduct is not relatively important to me at this point.  I am trying to determine whether they were there.  And they say they were there and Mr. Acevedo says they were there.  And he also is able to tell me what they did."

Later, the judge said:

"I find [Mr. Acevedo's] testimony to be flawless and I find that it is aided by the statements of the two defendants thus placing themselves there.  The only question then for me to determine is since everybody now agrees that they were there, and by everybody I mean Mr. Acevedo and two defendants, the only other question is did they do what they say they did or did they do what Mr. Acevedo said they did.  I believe Mr. Acevedo beyond a reasonable doubt."

The judge, after reviewing the evidence, found Thorne, along with Robinson and Powell, guilty of armed robbery and aggravated robbery and entered a judgment on the verdict for armed robbery.

The State responds that Thorne has waived the argument because he neither objected at trial nor raised the issue in his posttrial motion.  In Illinois, "
[b]oth
 a trial objection 
and
 a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial."  (Emphasis in original.)  
People v. Enoch
, 122 Ill. 2d 176, 186 (1988); 
People v. Williams
, 181 Ill. 2d 297, 322 (1998).  Thorne concedes that the issue has been waived but requests review of this issue under the plain error doctrine (134 Ill. 2d R. 615(a)) which provides an exception to the waiver rule.  See 
People v. Thomas
, 178 Ill. 2d 215, 235 (1997).   The State asserts that plain error should not apply because the evidence was not closely balanced and this issue is not of such magnitude to deny defendant a fair trial.  

The Illinois Supreme Court has held that the plain error rule may be invoked in two limited circumstances.   
People v. Nielson
, 187 Ill. 2d 271, 297 (1999).   First, the plain error rule may be invoked "where the evidence is closely balanced, so as to preclude the argument that an innocent person may have been wrongly convicted."  
Nielson
, 187 Ill. 2d at 297; 
People v. Vargas
, 174 Ill. 2d 355, 363 (1996).   Second, the plain error rule is proper where "the error is of such magnitude that there is a substantial risk that the accused was denied a fair and impartial trial, and remedying the error is necessary to preserve the integrity of the judicial process."  
Nielson
, 187 Ill. 2d at 297; 
Vargas
, 174 Ill. 2d at 363.  Therefore, before invoking the plain error exception, this court must first determine whether any error occurred.   
People v. Chapman
, 194 Ill. 2d 186, 226 (2000); 
People v. Johnson
, 347 Ill. App. 3d 570, 574 (2004).  

We disagree with Thorne's assertion that the above comment by the trial court judge supports a conclusion that the trial court judge considered Powell's statement when finding Thorne guilty.  In discussing his findings of fact, the trial court judge made it clear that only the evidence that applied to each defendant's case would be considered against that defendant.  Specifically, the trial court stated: "While the defendants are jointly on trial before the court each one of them is entitled to a separate and independent consideration of the evidence as it applies to him."  Unlike a jury, a trial judge in a bench trial is presumed to know the law and to follow it and "this presumption may only be rebutted when the record affirmatively shows otherwise."  
People v. Mandic
, 325 Ill. App. 3d 544, 546 (2001).  We find that the trial court judge discussed his factual findings in this manner for the sake of brevity given the fact there were three defendants who had  separate trials.  The court was simply noting that two of the defendants admitted their presence on the scene and the victim identified each defendant as being present.  In the statements given to police, Thorne and Powell implicated themselves.  Their individual statements placed them at the scene of the robbery.  While the statements were separate from one another, the same conclusion applies to each defendant based on their individual statements, and that conclusion is that each respective defendant's admission corroborates the victim's (Acevedo) identification of each defendant.

We believe the cases relied on by Thorne are distinguishable.  The case of 
Lee v. Illinois
, 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. at 2056 (1986)
, is distinguishable because the trial court in 
Lee
 expressly relied on the co-defendant's confession and his version of the killings in finding the defendant guilty.  
Lee
, 476 U.S. at 538, 90 L. Ed. 2d at 524, 106 S. Ct. at 2060-61
.  Here, however, the court expressly noted it was to consider the evidence separately and independently as to each defendant and to consider only the evidence that applied to each particular defendant.  The case of 
People v. MacFarland
, 228 Ill. App. 3d 107 (1992), is distinguishable because there the trial court "improperly admitted the nontestifying codefendant's statement when it overruled the defense counsel's objection to that statement being admitted against defendant."  
MacFarland
, 228 Ill. App. 3d at 121.  Since the trial court in 
MacFarland
 expressly overruled the defendant's objection to admitting the codefendant's statement and affirmatively allowed that statement into evidence against the defendant, the presumption that the trial court is presumed to know the law and consider only competent evidence was rebutted.  
MacFarland
, 228 Ill. App. 3d at 120-21.  In this case, the trial court judge separated the evidence for each trial and never affirmatively allowed Powell's statement into evidence against Thorne.  Therefore, we find no plain error because the trial court did not rely on Powell's statement when it found Thorne guilty.

CONCLUSION

In light of the foregoing, we hereby reverse the judgment of conviction for armed robbery and remand the cause to the circuit court of Cook County with directions to enter a judgment of conviction for robbery and to impose an appropriate sentence thereon.  See 
People v. Skelton
, 79 Ill. App. 3d 569 (1979), 
aff'd
, 83 Ill. 2d 58 (1980).

Reversed and cause remanded with directions.

REID, J., concurs.

O'BRIEN, J., dissents.

1-01-4112

Justice O’Brien, dissenting:

I respectfully dissent from the reversal of the armed robbery conviction and the remand to enter a conviction for robbery and sentence thereon.

Here, the State has admitted that there was no evidence regarding whether the gun was loaded and that the gun falls in to the third category of objects, those that can be used as a dangerous weapon.  Whether an object in the third category is a dangerous weapon is a question of fact to be resolved by the trier of fact.  
People v. Lindsay,
 263 Ill. App. 3d 523, 528.

Factually, defendant accompanied three other persons, one carrying a gun, and approached the victim.  One of defendant’s companions displayed the gun, demanded money from the victim and pointed the gun at the victim’s head.  Defendant and two of the companions went through the pockets of the victim and kept a look out while the third companion kept the gun at the victim’s head.  The victim described the weapon as a “black pistol” and the officers described the weapon as a ‘hard object’ and a Marksman .177 caliber black BB gun.

The trial court did not err in finding the gun held to the head of the victim was a dangerous weapon even without making a specific finding as to the weapon’s dangers.   
People v. Hill
, 47 Ill. App. 3d 976, 978.

Accordingly, I would affirm the trial court on all issues and respectfully dissent from the majority.

FOOTNOTES
1:  The current version of section 18-2 of the Criminal Code of 1961, which became effective on January 1, 2000, after the robbery in this case, adds a number of subsections regarding firearms and their use during a robbery.