2023 IL App (1st) 221716-U

No. 1-22-1716

Order filed September 27, 2023

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 20 CR 6597 |
| SAMER BATA, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Steven Jay Rosenblum, |
| | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Justices D.B. Walker and R. Van Tine concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defense counsel did not provide ineffective assistance for failing to request an instruction regarding weapons that are not inherently dangerous, and the trial court did not err by failing to *sua sponte* instruct the jury of the same.

¶ 2    On July 14, 2020, defendant Samer Bata was charged with one count of armed robbery and one count of robbery. A jury found him guilty of armed robbery on May 18, 2022, and he was subsequently sentenced to seven years in the Illinois Department of Corrections (IDOC).

Defendant now appeals, arguing that he received ineffective assistance of counsel where defense counsel failed to request Illinois Pattern Jury Instructions, Criminal, No. 4.17 (2022) (hereinafter IPI Criminal (2022)), and that the trial court erred by failing to *sua sponte* give the same instruction.

¶ 3    For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 4                                    I. BACKGROUND

¶ 5    On May 26, 2020, Matthew Hartmann was standing on his first-floor balcony smoking a cigarette when defendant walked by. Defendant approached and asked for a pair of scissors because he had burned the wrong end of a cigarette. Hartmann procured some scissors and handed them to defendant from the balcony, at which point the two both smoked a cigarette and chatted. Hartmann explained that he was an arborist, which seemed to interest defendant.

¶ 6    After defendant finished his cigarette, he departed, and Hartmann went back inside. Sometime later, defendant returned and rang the doorbell, seeking information about Hartmann's employer and he inquired about getting a job there. The two smoked another cigarette and continued to talk about their lives and philosophy. That second conversation lasted about ten minutes, at which point defendant left and Hartmann went inside.

¶ 7    After midnight Hartmann took his two black Labradors and went out to his car, which was in the visitor parking lot fifteen to twenty feet from his front door. Hartmann's dogs ran ahead toward the visitor parking lot, and he saw someone dart toward a tree and climb up it. Hartmann approached and realized it was defendant. He then retrieved his dogs and took them back inside

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

before returning to speak with defendant. Even with Hartmann's dogs gone, defendant refused to come down from the tree and the two continued to talk. At some point, the conversation turned to religion and defendant became agitated.

¶ 8 Hartmann noticed a bike near the tree which he assumed belonged to defendant. He began to ride the bike in circles around the tree and defendant said he would have to charge Hartmann two cigarettes for using his bike. Hartmann replied that he was not going to give defendant any more cigarettes. Defendant descended from the tree and told Hartmann he was going to have to take the headphones that were around Hartmann's neck. Defendant reached for the headphones and Hartmann swatted his hand away. Defendant followed that up by punching Hartmann in the face three times. A struggle ensued until Hartmann got defendant in a headlock and the two went to the ground. Defendant bit Hartmann in an unsuccessful attempt to free himself before producing a knife and poking it into Hartmann's back.

¶ 9 Hartmann let go of defendant and the two struggled for the knife as Hartmann shouted for help. Although Hartmann was ultimately able to disarm defendant and run back toward his apartment, his headphones had fallen to the ground during the struggle. Defendant picked them up, said, "Thank you for the headphones," got on the bike, and rode away.

¶ 10 After Hartmann called 911 and talked to the investigating officers, the police later escorted Hartmann to an individual they had apprehended. Hartmann identified defendant as the man who had attacked him. He suffered a bloody nose from the punches, some scratches and cuts on his arms that he received while trying to wrest the knife from defendant's control, and an injury on his back where the tip of the knife punctured the skin.

¶ 11 Defendant testified and his recounting of the first conversation between Hartmann and himself was virtually identical to Hartmann's description. After Hartmann went inside, defendant rang the doorbell to ask if Hartmann's employer was hiring. The two talked for twenty to thirty minutes, and defendant spent some of this time explaining Islam and the Six Pillars of Faith to Hartmann. Hartmann responded by mocking defendant's faith, calling himself "the devil" or "a prophet." According to defendant, Hartmann kept saying "blasphemous and absurd things." Defendant claimed he had discussed his faith with Hartmann because he "was trying to clear [himself] of responsibility of him—giving him an excuse to say I didn't know what faith was, you know, so he knows what faith is, afterlife. He's responsible for his deeds."

¶ 12 After the second conversation, Hartmann went back into his apartment. He later exited and walked toward where defendant was standing, and his dogs ran at defendant. Defendant climbed a tree to escape the dogs and Hartmann began riding defendant's bike in circles around the tree. While he was in the tree, defendant continued to explain Islam to Hartmann, and Hartmann continued to say, "blasphemous stuff, crazy things." Hartmann took his dogs back inside, and defendant climbed down from the tree. Defendant was upset that Hartmann rode the bike without permission, and asked Hartmann why he had done so. Hartmann responded by claiming that he was God and that he could do whatever he wanted.

¶ 13 Defendant asked how Hartmann would feel if he took Hartmann's headphones, and Hartmann responded, "You can have my headphones." Defendant explained that he did not actually want the headphones, but he was probing to see if Hartmann felt any remorse for "the stuff he said and the stuff he did." Defendant admitted that he reached out, took Hartmann's headphones off of him, and put them on.

¶ 14    Concluding that Hartmann had no remorse, defendant admitted that he threw the first punch. As he explained:

> "He was asking for it. He was really—you know, he really crossed the line with what he said and what he did. You know, his dogs attacked me. I don't know if that—I don't see how that's not against the law. And, you know, he was psychologically tormenting me, being psychologically abusive and disrespectful, disrespecting my property. I don't know how much stuff a person has to do before, you know, you can try to stop them. He really deserved it."

¶ 15    The two began wrestling after that until Hartmann placed defendant in a headlock. Defendant removed the knife from his back pocket, opened it, and pressed it into Hartmann's back, saying, "get the F off me" three times. Hartmann released him and defendant put the knife away, took Hartmann's headphones (despite insisting on cross-examination that he did not want them), got on his bike, and left.

¶ 16    When asked on cross-examination whether he told a detective that it would have been better if Hartmann had died, defendant said, "Yeah, I agree." The State followed up by asking, "You do agree that it would have been better if he died?" and defendant responded, "He has the right to live but, yeah. Like I said, corruption is worse than bloodshed."

¶ 17    While the jury was deliberating, it sent out a note asking whether one could commit armed robbery "if the person has a dangerous weapon on them, but doesn't use it?" The trial court responded to the note by directing the jurors to review the instructions.

¶ 18    The jury found defendant guilty of armed robbery, and the trial court subsequently sentenced him to seven years in the Illinois Department of Corrections (IDOC).

¶ 19                                    II. ANALYSIS

¶ 20     On appeal, defendant now asks for a new trial based on defense counsel's failure to request that the trial court instruct the jury with IPI Criminal (2022) No. 4.17, which states, "An object or an instrument which is not inherently dangerous may be a dangerous weapon depending on the manner of its use and the circumstances of the case." That instruction is appropriate when the alleged weapon is not inherently dangerous. IPI Criminal (2022) No. 4.17. Alternatively, defendant contends that plain error occurred when the trial court failed to *sua sponte* instruct the jury with IPI Criminal (2022) No. 4.17.

¶ 21                          A. Ineffective Assistance of Counsel

¶ 22     Defendant claims that defense counsel provided ineffective assistance by failing to request IPI Criminal (2022) No. 4.17 because defendant's knife was not an inherently dangerous weapon and the jury should have been alerted that it could consider the circumstances of the case and the manner of the knife's use when determining if defendant was armed with a dangerous weapon.

¶ 23     The United States and Illinois Constitutions guarantee every criminal defendant the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. To sustain a claim of ineffective assistance, one must show both that defense counsel's performance was deficient, measuring it against an objective standard of competence under prevailing professional norms, and that but for counsel's deficient performance, there was a reasonable probability that the outcome of the case would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Id*. at 694. The benchmark for judging any claim

of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Id*. at 686.

¶ 24     However, judicial scrutiny of counsel's performance must be highly deferential. *Id*. We should indulge the strong presumption that defense counsel's conduct falls within a wide range of reasonable professional conduct, and defendant must overcome the presumption that the challenged action might be considered sound trial strategy. *Id*. at 689. When a claim of ineffective assistance is raised for the first time on appeal, our review is *de novo*. *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24.

¶ 25     The purpose of jury instructions is to provide to the jury the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence. *People v. Novak*, 163 Ill. 2d 93, 115-16 (1994) (abrogated on other grounds by *People v. Kolton*, 219 Ill. 2d 353 (2006)). Generally, counsel's choice of what jury instructions to tender to the court is a matter of trial strategy. *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 97. Thus, counsel's decision as to which jury instructions to tender can support a claim of ineffective assistance only if that choice is objectively unreasonable. *Id*. When the evidence against a defendant is overwhelming, the lack of a particular instruction is harmless in light of the other instructions, arguments of counsel, and a generally fair trial. *Id*. However, the failure to offer an instruction essential to the fair determination of the case by the jury cannot be excused as trial strategy. *People v. Lowry*, 354 Ill. App. 3d 760, 767 (2004).

¶ 26     In order to answer the question of whether defense counsel committed an unreasonable error by failing to request IPI Criminal (2022) No. 4.17, we must consider the question of whether

defendant's knife was inherently dangerous. If it was, then there was no need for the instruction in question.

¶ 27 The armed robbery statute does not contain a definition of "dangerous weapon." *People v. Thorne*, 352 Ill. App. 3d 1062, 1070 (2004). But our supreme court has acknowledged that a dangerous weapon includes "any object sufficiently susceptible to use in a manner likely to cause serious injury." *People v. Ligon*, 2016 IL 118023, ¶ 22. Our supreme court has divided dangerous objects into three categories: (1) objects that are dangerous *per se*; (2) objects that are not necessarily dangerous, but were actually used in a dangerous manner during the robbery; and (3) objects that are not necessarily dangerous, but may become dangerous when used in a dangerous manner. *People v. Ross*, 229 Ill. 2d 255, 275 (2008).

¶ 28 Multiple courts have taken the position that a loaded gun or a knife is always inherently dangerous. *See e.g. Thorne*, 352 Ill. App. 3d at 1070 ("The first category consists of objects that are dangerous *per se*, such as knives and loaded guns"); *People v. Neither*, 166 Ill. App. 3d 896, 900 (1988) ("Certain weapons, such as knives and operative guns, are dangerous as a matter of law whenever they are in possession of a robber, even when their sole role in the robbery was display, in order to put the victim in fear, or when they played no role in the robbery whatsoever"); *and People v. Flores*, 245 Ill. App. 3d 149, 158 (1993) ("A knife or a loaded gun, when used in a robbery, is always considered a dangerous weapon").

¶ 29 Defendant urges us to disregard cases like *Neither* because the court did not consider whether knives are *per se* dangerous, only whether there was sufficient evidence to conclude that the knife used was a dangerous weapon, and because those cases are based on a framework that is "decades old." It is true that in *Neither*, the issue was whether there was sufficient evidence to

sustain a conviction for armed robbery based on the use of a knife, and not whether a knife is dangerous *per se*. *Neither*, 166 Ill. App. 3d at 900-01. Likewise, in *Flores*, the issue was whether defense counsel provided ineffective assistance by arguing that a baseball bat was not a dangerous weapon, and not whether a knife is dangerous *per se*. *Flores*, 245 Ill. App. 3d at 157-58. And in *Thorne*, the ultimate issue was whether a BB gun qualified as a dangerous weapon. *Thorne*, 352 Ill. App. 3d at 1071-72.

¶ 30    When our supreme court decided *Ross*, it listed the first category of dangerous weapon as "objects that are dangerous *per se*, such as loaded guns," and did not include knives. *Ross*, 229 Ill. 2d at 275. But it also did not exclude knives from that category or state that loaded guns are the only weapons that are dangerous *per se*, nor did it overrule any of these cases that listed knives and operative guns together as dangerous weapons *per se*. To the contrary, in laying out the three categories of dangerous objects, the supreme court cited *People v. Lindsay* with approval, which classified knives and loaded guns as dangerous *per se*. *Ross*, 229 Ill. 2d at 275 (*citing People v. Lindsay*, 263 Ill. App. 3d 523, 528 (1994)).

¶ 31    Although defendant claims that *Ross* "reformed the analytical framework used to determine whether an object is a dangerous weapon," that does not appear to be the case. For example, in *Thorne*, we divided weapons into four categories: (1) objects that are dangerous *per se*; (2) objects that are never dangerous; (3) objects that are not necessarily dangerous but can be used as such; and (4) objects that are not necessarily dangerous, but were used in a dangerous manner in the course of the robbery. *Thorne*, 352 Ill. App. 3d at 1070-71. *Ross* did not reformulate these categories so much as simply swap their order and omit any discussion of weapons that are never dangerous. *Ross*, 229 Ill. 2d at 275.

¶ 32    The fact that the knife in this case belongs in the category of weapons that are dangerous *per se* is supported by examples of other items we have identified as belonging in the remaining two categories. *See Thorne*, 352 Ill. App. 3d at 1071-72. For example, in *Bayless*, a toy gun was included in the category of weapons that are not necessarily dangerous but could be used as such because its size, shape, weight, and composition made it capable of inflicting serious harm if used to batter the head and face of a victim. *People v. Bayless*, 99 Ill. App. 3d 532, 538 (1981). Another instance of such an object was a set of fingernail clippers with a sharpened file. *People v. Robinson*, 73 Ill. 2d 192, 201-02 (1978). Finally, a starter pistol used to bludgeon a person was recognized as an object that is not necessarily dangerous but was used in a dangerous manner. *People v. De La Fuente*, 92 Ill. App. 3d 525, 535-36 (1981); *see also People v. Johnson*, 2018 IL App (1st) 153634, ¶ 15 (holding that pepper spray falls into the category of objects that can be used in a dangerous manner). These sorts of circumstantially dangerous items are a far cry from defendant's knife here.

¶ 33    While defendant repeatedly refers to it as a pocketknife, which may be true in the most literal sense, describing it thus does not do the weapon justice. The term pocketknife tends to conjure up images of a small utility object containing a narrow, folding blade and a number of other apparatuses such as a file, scissors, or nail clippers. Such an item might comport with defendant's unsupported claim that the knife is of the type that is "commonly used and carried around." The photographs contained in the record on appeal reveal defendant's knife to be a different animal. It appears to be comprised of a plastic or metal handle which houses nothing but a folding blade. The blade itself is serrated closest to the handle, and asymmetrically curves upward toward the tip. The trial evidence does not reflect the dimensions or exact properties of the blade, but the parties have repeatedly referred to the weapon as a "three-inch pocketknife," and based on

that, the blade appears to have a width of approximately one inch at its widest point. It is impossible to look at such a weapon and be ignorant of its inherent ability to inflict severe, even lethal, injury to a person.

¶ 34    In *People v. Westefer*, the court found that a utility knife with a six-inch grip and a one-inch blade was dangerous *per se*. *People v. Westefer*, 169 Ill. App. 3d 59, 62 (1988). Defendant insists that finding his knife to be dangerous *per se*, as *Westefer* did, would be an absurd result because it would require "indifference to the legitimate purpose for which an object can be possessed." We can only guess at what the alleged legitimate purpose of defendant's knife was, given that defendant makes no attempt to offer any examples. It is difficult to conceive of any circumstances where the dangerousness of this knife, with its three-inch, serrated blade, would be contingent on the manner of its use like a toy pistol or a nail file.

¶ 35    Additionally, while the definitions of "dangerous weapon" for armed robbery and armed violence are not identical, with the definition for armed robbery being broader, *People v. Hernandez*, 2016 IL 118672, ¶ 16, the armed violence statute is at least instructive. There, a dangerous weapon includes, among other things, a "knife with a blade of at least three inches in length." 720 ILCS 5/33A-1(c)(2). Thus, while not dispositive or controlling, this definition at least finds some semblance of consistency with our analysis here.

¶ 36    Together, all of these considerations reflect that defendant's knife was a dangerous weapon *per se* and defense counsel committed no error by declining to request IPI Criminal (2022) No. 4.17. Moreover, defense counsel's theory of the case, and closing argument, was that defendant did not take Hartmann's headphones by force or the threat of imminent force and that defendant's use of force was only to defend himself. In doing so, counsel's strategy sought to defend against

an essential element of armed robbery that had nothing to do with the character of the weapon. 720 ILCS 5/18-2(a). Defense counsel's decision not to request IPI Criminal (2022) No. 4.17, which was nonessential, was nothing more than trial strategy. However, even if defense counsel was in error by failing to request IPI Criminal (2022) No. 4.17, defendant must still establish that he was prejudiced by this failure, which he cannot do.

¶ 37    The jury's question during deliberations asked whether the offense is still "considered armed robbery if a person has a dangerous weapon on them, but doesn't use it." Defendant claims that this question demonstrated prejudice because it was "struggling with the idea that such a small knife, produced so late in a prolonged encounter, was a 'dangerous weapon' as envisioned by the armed robbery charge." But the jury did not ask whether a weapon is considered dangerous if it is not used in the robbery. Instead, it seems that the jury believed defendant had a dangerous weapon and was simply unsure of whether the offense required him to use it on Hartmann.

¶ 38    Defendant also claims he was prejudiced because the instruction would have been an effective response to the State's argument that it did not matter why defendant used the knife, only that he did. Defendant claims "why [defendant] took the pocketknife out speaks directly to 'the circumstances of the case' and how he used it." Of course, the circumstances surrounding why defendant produced the knife are not nearly as sympathetic as defendant believes them to be—even under defendant's version of events. Defendant was the one who started the physical altercation by attacking Hartmann, and then escalated it and introduced a risk of inflicting serious injury by pressing a knife into Hartmann's back when Hartmann managed to subdue him. The notion that he only produced the knife because the fight he started was not going as well as he hoped is not the compelling self-defense argument he thinks it is.

¶ 39    Then, there is the matter of defendant's statements. His beliefs that it would have been better if Hartmann had died over this senseless incident and that "corruption is worse than bloodshed," are frightening, to say the least. Defendant's own statements reflect that he believed lethal violence in this encounter would have been an appropriate reaction to Hartmann's actions and statements. Even if the jury was instructed with IPI Criminal (2022) No. 4.17, given defendant's use of the knife to escalate a violent conflict that he started and his beliefs about the propriety of violence, how could a jury reach any conclusion but that defendant's knife was a dangerous weapon? Defense counsel's decision not to request IPI Criminal (2022) No. 4.17, even if it was an error, did not result in prejudice sufficient to undermine confidence in the outcome of this trial.

¶ 40    Accordingly, defense counsel did not provide ineffective assistance of counsel.

¶ 41                                      B. Plain Error

¶ 42    Alternatively, defendant contends that the trial court erred by failing to *sua sponte* instruct the jury with IPI Criminal (2022) No. 4.17. Defendant did not make a contemporaneous objection at trial, so we must consider whether this issue is reviewable as plain error.

¶ 43    Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court. Ill. S. Ct. R. 615(a). The plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 44     However, the first step in any plain error analysis is to determine whether error occurred at all. *Id*. For the same reasons we articulated earlier, there was no error in failing to instruct the jury with IPI Criminal (2022) No. 4.17. Moreover, it is the burden of the party who desires a specific instruction to present it to the court and request that it be given to the jury. *People v. Turner*, 128 Ill. 2d 540, 562 (1989). "Generally, the only situations where a fair trial requires the court to *sua sponte* offer an instruction include 'seeing that the jury is instructed on the elements of the crime charged, on the presumption of innocence and on the question of burden of proof.' " *Id*. at 562-63 (quoting *People v. Parks*, 65 Ill. 2d 132, 137 (1976)). The instruction defendant now claims that the court should have tendered does not fall into that category.

¶ 45     Accordingly, because no error occurred, we need not reach the prongs of the plain error analysis that consider whether the evidence was closely balanced or whether the error was so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process.

¶ 46                              III. CONCLUSION

¶ 47     For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 48     Affirmed.