2020 IL App (1st) 180035-U

FIFTH DIVISION
November 13, 2020

No. 1-18-0035

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13 CR 19299 |
| | ) ) ) | |
| GERAUD NICHOLS, | ) ) | Honorable Clayton Crane and Alfredo Maldonado |
| Defendant-Appellant. | ) | Judges, presiding. |

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Hoffman and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The State proved defendant guilty of aggravated criminal sexual assault with a dangerous weapon, namely, a bludgeon. Admission of the replica gun into evidence was not reversible error. The circuit court did not err in admitting evidence of a prior sexual offense. Defendant's right to a speedy trial was not violated. The State's closing arguments were not improper. Defendant's sentence is not excessive. Affirmed.

¶ 2    Following a jury trial, defendant Geraud Nichols was convicted of two counts of aggravated criminal sexual assault and one count of aggravated kidnapping. The circuit court merged the aggravated kidnapping conviction into the aggravated criminal sexual assault

convictions and sentenced defendant to an aggregate term of 56 years' imprisonment.  Defendant now appeals, contending that (1) the evidence was insufficient to prove him guilty of aggravated criminal sexual assault with a dangerous weapon, namely, a bludgeon; (2) a replica gun was improperly admitted into evidence; (3) the court erred in admitting evidence of a prior sexual offense; (4) his right to a speedy trial was violated; (5) the State's closing arguments were improper; and (6) his sentence is excessive.  We affirm the judgment of the circuit court.

¶ 3                                                                  BACKGROUND

¶ 4      The State charged defendant by information with, *inter alia*, four counts of aggravated criminal sexual assault in connection with an August 29, 2013, incident involving the victim, L.D. The State proceeded to trial on one count of aggravated kidnapping and two counts of aggravated criminal sexual assault with a dangerous weapon (counts 5 and 6).  Six months before trial began, the State sought to amend counts 5 and 6 to replace the word "firearm" with "bludgeon," but it did not ask to change the statutory section cited in the counts, which was originally set forth as "CHAPTER 720 ACT 5 SECTION 11-1.30(a)(1)."  Defendant did not object, and the circuit court granted the State leave to amend the counts.  The record indicates that counts 5 and 6 were altered by hand to strike the word "firearm" and substitute the word "bludgeon."  In addition, the "(1)" in the statutory citation (*i.e.*, CHAPTER 720 ACT 5 SECTION 11-1.30(a)(1) was stricken and "(3)" was handwritten underneath.[1]

---

[1] The statutory citation in defendant's mittimus, however, indicates he was convicted for both aggravated criminal sexual assault offenses under subsection (1), which was the citation applicable to the original charges.

¶ 5                        Pretrial Motion to Admit Propensity Evidence

¶ 6     Before trial, the State moved to allow other crimes evidence, specifically, evidence of defendant's sexual assault against L.H. and subsequent arrest and discovery of a "BB gun" on his person.  The State argued that this evidence  would show (1) defendant's propensity to commit aggravated criminal sexual assault, (2) identity, (3) intent, (4) motive, and (5) lack of consent.  The State argued that the arrest for the BB gun would show "circumstances or context of the defendant's arrest, placement of the defendant in proximity to the time and place of the crime and identification of the weapon used in the crime."  The State argued that the offenses were factually similar, and the State further noted that the uncharged assault against L.H. generated DNA matching defendant's DNA.   Defendant countered that the prejudicial effect substantially outweighed the probative value.  Following a hearing, the circuit court granted the State's motion, but it barred the State from eliciting testimony that officers were responding to a call of a "man with a gun."   Instead, the court instructed the State to only indicate that officers encountered defendant, and following a pat-down, a gun was recovered.

¶ 7                                    Trial

¶ 8     The trial began on September 12, 2017.  L.D. testified that she was 33 years old and that on the evening of August 29, 2013, she joined friends to have some drinks.  She and her friend Gloria Smith were at a Subway restaurant in the area of East 79th Street and South Cottage Grove Avenue in Chicago.  At around or 9 or 9:30 p.m., defendant—whom L.D. did not recognize—approached the two women and "basically said he needed somebody to walk with him because he had a bunch of weed on him and he didn't want to get stopped by the police."  L.D., defendant, and Gloria then began walking toward 79th and South Langley Avenue, but at some point, Gloria

stopped walking with them because defendant, who had offered to pay to have someone walk with him, clarified that he was only going to pay one of them. Defendant and L.D. continued walking.

¶ 9 When they approached an alley around East 78th Street and Langley, L.D. said defendant's demeanor changed. Defendant lifted his shirt, and L.D. saw the butt of a gun in his waistband. When the State asked L.D. how she knew it was a gun, L.D. replied, "Because I know what guns look like." They were in the alley behind a building when defendant told L.D. that he wanted her to "suck his dick." L.D. said she started, "freaking out, crying, begging him not to do it." L.D. said her voice was raised, and defendant became nervous and told her to calm down.

¶ 10 Defendant, with his hand on L.D.'s shoulder, then walked her down the alley her toward East 76th Street. L.D. did not feel like she was able to leave for fear of defendant shooting her. L.D. noticed a few people out but did not feel that she could safely cry for help. Defendant walked L.D. to an abandoned building near East 75th Street and South Maryland Avenue. They entered through a back entrance and went to the second floor. L.D. said the building was "disgusting," with trash and "boards everywhere." She added, "You could tell no one lived there for years."

¶ 11 When they arrived at the second floor, L.D. said defendant told her to "suck his dick," and further told her that if she valued her life she would "suck it like you wanna live." Defendant then put his penis in her mouth. At some point, defendant told her, "[S]trip, bitch," L.D. lifted her skirt and removed her vest and leggings. Defendant then took his penis out of her mouth and told L.D. to lie on the floor. L.D. lay on her back, and defendant put his penis in her vagina without using a condom. Defendant told L.D. to "tell me you love this dick, say this dick yours [*sic*], and stuff like that." At some point, defendant removed his penis from her vagina and told her to get on her hands and knees. Defendant put his penis back into her vagina "for a little more minute," and then

4

took his penis out and masturbated until he ejaculated on her buttocks. Afterwards, defendant wiped his face and his penis with L.D.'s vest before throwing it at her.

¶ 12    Defendant then went through L.D.'s purse and removed her phone. Defendant saw photos of L.D., her baby, and the father of her child. After defendant asked her if that was her son and family, defendant warned her not to tell anyone or else he would "come after you all." L.D. put her clothes on, and defendant told her to stay where she was and wait until he left. L.D. said she waited for about two minutes before walking out. L.D. saw defendant "on the side of the building," and he told her to go another way. L.D. ran through a field to her home, about four blocks away.

¶ 13    When L.D. arrived near her home, she saw her boyfriend in the park. L.D. said she was crying, and when he asked what was wrong, she said she just wanted to go home and "basically that I just been raped." When L.D. got home, her cousin A.Y. and her cousin's girlfriend L.B. were there. L.D. did not immediately tell them what happened and instead went to the bathroom to get into the bathtub. L.B. went into the bathroom and asked what was wrong. L.D. told L.B. what had happened, and L.B. then called the police, who filed a report on the incident.

¶ 14    L.D. then testified that, in the early evening hours of September 3rd, she was walking down the street with some friends around East 79th Street and South Cottage Grove Avenue. L.D. saw defendant by himself walking toward her, and she said she "froze for a second" and "freaked." L.D. said there was no interaction with defendant at the point, and she walked back along South Langley Avenue and told her friends that she had just seen defendant. L.D. then went to the house of an "uncle"—whom she clarified was a family friend—named Shannon Arrington, whose house was across the street. L.D. told Shannon whom she saw, and they went looking for defendant.

¶ 15    After about ten minutes, they saw defendant walking with a woman. L.D. said she froze again and told Shannon that she saw him. Shannon stopped defendant at a currency exchange at

79th and Cottage Grove, telling him that L.D. had accused him of raping her.  While Shannon was detaining defendant, L.D. found a security officer from a nearby liquor store and told him what was happening.  After the security officer arrived, L.D. then flagged down a police officer who was driving in the area.  L.D. eventually went to the police station and identified her phone that defendant had taken after the assault.  L.D. added that there were apparent "selfies" (*i.e.*, self-portrait photographs) of defendant on her phone.

¶ 16    Shanta Hyde testified that she is defendant's cousin.  At around 6 or 7 p.m. on September 3, 2013, she and defendant were in the area of 79th and Cottage Grove when they were approached by "two females."  The "older lady" said to defendant, "[M]y niece [said] that you raped her, is that true?"  Hyde then said that the "younger lady" started screaming at them, "[D]o you know me?  I spent the night at your house."  Hyde said she did not know her and had never seen her before.  The younger woman accused defendant of raping her and then flagged down the police.

¶ 17    According to Hyde, when the police arrived, they arrested defendant and ordered him to empty his pockets.  Defendant placed his belongings in her purse.  Hyde went home and then discovered that among the belongings were L.D.'s cell phone and two lighters.  Hyde said she knew it was the younger lady's phone because she saw the younger lady's photograph and (Hyde believed) the younger lady's husband and children.  Hyde brought the phone to the police.

¶ 18    L.B. then testified that she was one of L.D.'s roommates.  At around 10:30 or 11 p.m. on August 29, 2013, L.B. had just returned home from school and heard someone "beating and knock[ing] on the door and ringing the doorbell."  When L.B. went to the front door, she saw it was L.D., who was "hysterical, crying[,] and screaming."  L.B. further stated that L.D.'s clothes were dirty, and her hair was "messed up" with dirt in it.  L.D. said that she wanted to "get him off me" and get into the bathtub.  L.D. kept telling L.B. that she had been raped and that her attacker

6

"put a gun to her head." L.B. then called the police. L.D. spoke to the police and went with the police and L.B. to show them the building where the attack took place.

¶ 19    The parties stipulated that police officers collected DNA samples from defendant and L.D. as well as the clothing that L.D. was wearing at the time of the assault. Forensic scientists testified that the semen that was found on L.D.'s skirt and vest matched defendant's DNA.

¶ 20                                    Prior Crimes Evidence

¶ 21    L.H. testified that, at around 11 p.m. on June 4, 2013, she was 24 years old and was spending time with some friends after a job interview she had had earlier that day. She then took a bus to a convenience store around 79th and South Ingleside Avenue to buy cigarettes. While she was there, she saw a man she knew from the neighborhood, and they hugged. As she was about to leave, she realized that her cell phone was missing, and the convenience store clerk told her that the man she had hugged took her phone. L.H. then left the store and walked after the man, who L.H. said was across the street on a bike.

¶ 22    At that point, L.H. said that defendant walked up behind her and placed "something hard" into her back, which L.H. believed was a gun. Defendant told L.H. to keep walking, and they walked southbound on Ingleside toward East 80th Street. They then walked along 80th and turned right and headed northbound into an alley between South Maryland Avenue and South Drexel Avenue. Defendant walked L.H. to the "gangway" of an apartment building, took her purse, and emptied it onto the ground. Defendant then told L.H. to remove her clothing.

¶ 23    On direct examination, L.H. testified as follows:

> Q.  Were there any people in the back of that building as he
> is telling to you [*sic*] strip?
>
> A.  No.

> Q. Did you see anyone else in the vicinity either in the alley
>
> or in the back of that building as the defendant is ordering you to
>
> take off your clothes?
>
> A. No."

L.H. was facing defendant and saw him with a black handgun in his right hand.

¶ 24    Defendant turned L.H. around, bent her over, and penetrated her vagina with his penis. Defendant did not use a condom. L.H. said that, after he "finished," defendant—who was still holding the gun—let L.H. put her clothes back on. They then sat on the stairs of the building, and defendant talked with L.H. while she listened. L.H. estimated that they were there for about an hour but was not certain of the amount of time because she did not have her phone.

¶ 25    L.H. believed it was after midnight when defendant walked her to the front of a building on Drexel near 79th. Defendant was still holding onto the gun but put the gun in his pocket when someone let them into the building. Inside the building, L.H. saw a couch to her left and three or four children, who were no older than six, asleep on the floor. There were also two females and a male in the residence, but L.H. did not know them or speak to them.

¶ 26    L.H. said she initially sat on the couch, but then defendant removed the cushions and placed them on the floor. L.H. did not feel that she could leave because she knew defendant had a gun and she was concerned that, "if he tried to do anything, the kids [were] right there." L.H. then lay down on the cushions on her side with defendant right behind her on his side, in a "spooning" position. L.H. recalled feeling defendant's gun pressed against her back while they were lying down. L.H. said she lay there with defendant until sunrise, but she was never able to fall asleep.

¶ 27    At sunrise, L.H. and defendant left. Although the other adults were awake, L.H. said nothing to them because she just wanted to leave. L.H. stated that defendant offered to help her

find her stolen phone, so they returned to the convenience store to get the address of the person L.H. suspected had stolen her phone. Defendant walked L.H. to that residence, but an "older lady" answered the door and said the individual was not there at that time.

¶ 28    At around 9 or 10 a.m. that morning, L.H. said she and defendant were in front of the store when she saw the police arrive and arrest defendant. L.H. then walked home and slept for the entire day. The next day, L.H. went to a clinic for sexually transmitted disease testing, but when clinic personnel realized L.H. had been raped, she was taken by ambulance to a hospital. L.H. testified that she did not intend to tell anyone that she had been raped because she "didn't want to do what I'm doing now." L.H. later identified defendant in a lineup as the person who raped her.

¶ 29    On cross-examination, L.H. denied that, on two separate occasions, she had told (1) detectives and (2) defense counsel and a defense investigator that defendant had initially offered to help her recover her phone. The parties later stipulated that Chicago police detective Roxana Hopps would testify that L.H. told her defendant had offered to help L.H. recover her phone. The parties further stipulated that defense investigator Whitney Harris would also testify that L.H. made substantially the same statements to him and defense counsel.

¶ 30    After L.H.'s testimony, the jury was excused, and the circuit court called the parties to a sidebar. The court stated that it "wasn't quite sure what [the prior judge's] ruling [regarding prior crimes evidence] was." Following a discussion with both parties' counsel and a review of the transcript from the hearing on the motion, the court said it would "redo this motion to have a ruling that's clearer." The court examined the proximity in time between L.H.'s and L.D.'s assaults, the degree of factual similarities, and other relevant facts and circumstances. The court found that the assault on L.H. was proximate in time to L.D.'s assault. The court then noted that, although there were "some" differences between the two assaults, "the overarching similarity is pretty obvious"

and that there was "quite a bit of factual similarity." Finally, regarding other relevant facts and circumstances, the court found that the prior judge's intent was to grant the motion. The court then allowed the State to introduce L.H.'s assault for the purposes of intent and propensity.

¶ 31 Chicago police officer Jair Martinez testified that, at around 8:46 a.m. on June 5, 2013, he and his partner, Officer Hicks, were in a marked police car and were directed to 7857 South Ingleside. When they arrived, Officer Martinez conducted a field interview of defendant and then a protective pat-down, during which Officer Martinez discovered a black replica handgun from defendant's waist. Officer Martinez arrested defendant and placed the handgun into inventory.

¶ 32                                             Defense Evidence

¶ 33 After the State rested, the defense presented its case in chief. Defendant testified on his own behalf. Defendant conceded that he had prior convictions for burglary and possession of a stolen motor vehicle. Defendant denied sexually assaulting both L.D. and L.H. Instead, defendant stated that, on the evening of August 29, 2013, he left his cousin's house and went to the intersection of 79th and Cottage Grove, where he met L.D. They spoke about sharing the marijuana, but neither had a "blunt" (a hollowed-out cigar), so they bought one at the nearby gas station. They then walked to a two-flat building near East 77th Street and Langley.

¶ 34 Defendant stated that they went to "the second floor in the hallway," and L.D. played some music from her phone while defendant "rolled up" the marijuana. L.D. then started dancing and "twerking," which defendant described as "bouncing [her] butt." Defendant said he reached into his pants and grabbed his penis, and then L.D. started rubbing her buttocks against defendant. Defendant said that he eventually ejaculated onto L.D.'s buttocks while she was dancing. L.D. then stopped dancing, turned around, and continued smoking the "blunt." Defendant wiped his penis with "something on the stairs that was black."

¶ 35    While defendant was looking at his phone, he noticed another man with dreadlocks walk up the stairs, take L.D.'s purse from the bannister, and run down the stairs. Although L.D. yelled at defendant to stop him, defendant said he laughed because of "the weed and the situation [being] unexpected." Defendant went to leave while L.D. was yelling at him to retrieve her purse. Defendant saw the individual run down the street and drop the purse. L.D. then crossed the street and retrieved it. Defendant continued walking away, but L.D. followed him, "screaming," and when defendant turned around, L.D. threw her phone at him. The phone went "past [defendant's] head," and L.D. ran away. Defendant then picked up L.D.'s phone.

¶ 36    With respect to the incident involving L.H., defendant stated that on June 3, 2013, he left his cousin's house and was going to his girlfriend's house when he heard a lot of yelling and screaming. Defendant found out that someone had stolen L.H.'s phone. Defendant said that he met L.H. on his birthday (April 13) and the two had been having a sexual relationship. Defendant offered to help L.H. and spoke to people in the store and learned that he knew the person who took her phone. Defendant and L.H. went to the individual's neighborhood, but he was not there.

¶ 37    According to defendant, L.H. started crying, so defendant offered to walk with her. L.H. told defendant that she could not go home without her phone because her mother had purchased it for her. Defendant then took L.H. to Hyde's house at around 1:30 a.m. Defendant agreed that he put the couch cushions on the floor, but he said that he stayed because L.H. was not comfortable there. When defendant lay down behind L.H., she touched his penis, and the two had sex.

¶ 38    Defendant and L.H. awoke and went to the house belonging to the individual who took L.H.'s phone. Defendant said they obtained L.H.'s phone, but the individual's grandmother called the police after seeing a gun fall down defendant's pants leg when defendant returned L.H.'s phone. Later, when defendant and L.H. were coming out of the convenience store, a police made

11

a U-turn and the officers got out, stopped defendant (at which point defendant first learned L.H.'s name), and took his "BB" gun. Defendant asked L.H. to take the property the police removed from his pockets and to give it to his cousin Hyde, who would give it to defendant's girlfriend.

¶ 39   On cross-examination, defendant said he could not recall whether L.D. was present when he was arrested. Defendant admitted that, when he spoke to a female detective, he never told her that (1) he and L.D. smoked marijuana, (2) L.D. danced for him, (3) he masturbated and ejaculated while L.D. danced, (4) someone came up the stairs afterwards and stole L.D.'s purse, (5) L.D. chased the individual and became angry when defendant laughed, (6) the individual dropped L.D.'s purse, and (7) L.D. threw her phone at defendant.

¶ 40   Regarding L.H., defendant said that, after meeting L.H., they had sex about twice per week. Defendant stated that he spoke to a female detective about L.H. on January 7, 2014, and told the detective that he knew L.H., but he did not state that he had a consensual sexual relationship with L.H. because the detective did not ask him. Defendant, however, acknowledged that, in his signed statement, there was nothing to indicate that he either knew L.H. or had a consensual sexual encounter with her on June 4, 2013. Defendant conceded that, at the time he signed his statement, he believed the police were only discussing L.H. Defendant further admitted that his statement indicated that, on August 29, 2013 (the date of L.D.'s assault), he was with his girlfriend from 8 p.m. until 3 a.m., and he never left the house.

¶ 41                              Rebuttal Evidence

¶ 42   The State called Detective Hopps in rebuttal, who testified that she was assigned to investigate L.D.'s sexual assault allegation against defendant. Detective Hopps said she did not speak with defendant in January 2014, and that she assisted defendant with his written statement on September 5, 2013. Hopps further stated that, although Hopps was investigating L.D.'s sexual

assault (which took place in August), defendant believed that he met L.D. in June (the time of L.H.'s assault). Defendant further told Hopps that he could not recall L.H.'s name.

¶ 43                     Closing Arguments, Jury Instructions, & Verdict

¶ 44    Before closing arguments, the court admonished the jurors that closing arguments are not evidence and that they should disregard any argument that is not based on the evidence.

¶ 45    During its initial closing argument, the State argued as follows:

"And then at that point [defendant] forces his penis into [L.D.'s] mouth. Forces her to perform oral sex on him. When he takes his penis out of her mouth, he tells her to strip. He uses the word strip. ***

* * *

[Defendant] knew that the porches didn't have lights on them. He knew where he was taking [L.H.]. She had no idea where she was, and the defendant had a gun. He ordered [L.H.] to strip. Again the word strip and she obeyed. She took all of her clothes off. And when the defendant got behind a naked and scared [L.H.], he still had that gun. He held it on her the whole time. He forced his penis into her vagina. He raped [L.H.] without a condom, again without a condom."

After recounting the remaining evidence regarding L.H.'s assault, the State discussed the verdict forms and certain jury instructions, arguing at length that the evidence mandated a guilty verdict.

¶ 46    During defendant's closing argument, defense counsel attacked the credibility of both L.D. and L.H. Counsel stated, "What happened here was that [L.D.'s] expectations were not met."

Counsel argued L.D. would never walk with defendant if she did not already know him. Defendant noted that L.D. lived in Englewood and "knows what's going on" there in terms of neighborhood violence. Defendant added that, according to L.D., defendant walked up to her at night, said he "ha[d] a bunch of drugs on him," and wanted L.D. to walk with him so that the police would not stop him. After pointing out that L.D. did not know defendant's name or nickname or where they were walking, counsel said there were multiple "red flags" regarding L.D.'s testimony. Counsel argued it was not credible that, despite the fact that they both "have been living in this area all this time, L.D. stated that she did not know defendant and had never seen him before until a few days after her purported assault. Counsel further observed that, although L.B. (the girlfriend of L.D.'s cousin) testified that L.D. said defendant put a gun to L.D.'s head, L.D. never testified to that.

¶ 47    Turning to L.H.'s allegation of rape, counsel told the jury that "you do have to determine whether or not that happened. You just don't take her word that that happened." Defense counsel then argued that L.H.'s testimony was not credible, relying upon a stipulation between the parties. Counsel stated as follows:

> "*** That stipulation was regarding [defense] Investigator Harris. And in that stipulation it stated that me and Investigator Harris went to talk to [L.H.] And she told us the same thing, the same thing on June 14, 2017. Four years later she told us the same thing[:] that [defendant] offered to help her get her phone back when he got out of the store. But now when she's talking to you, ladies and gentlemen of the jury, she says that didn't happen. He just walked up on me [*sic*] with a gun.

¶ 48    Defense counsel then discussed L.H.'s testimony as to her purported assault:

> When we talk about the overall story of [L.H.], we start to see more problems. So the way [L.H.] states it first [defendant] didn't help her to get her phone back when she came out of the store. He just walked up on [*sic*] her. Took her in an alley. Stripped her— had her strip. Raped her. Then sat her on the stairs and had pillow talk for an hour. Sat down and they talked.
>
> And then when he decided that he was done talking, he took her into his family's house where *** there were at least two women, one man, and three or four children in the house. ***. Sets pillows on the floor and then they spoon all night. That's no rape I've ever heard of."

Counsel also challenged L.H.'s testimony that defendant offered to get her phone back the morning after defendant had assaulted her and slept next to her in his family's home.

¶ 49    During its rebuttal argument, the State commented on the credibility of its witnesses' statements. The State made the following comments:

> "And when you decide or you're weighing the credibly [*sic*] of the witnesses including the defendant and their testimony there are things you can consider like the person's demeanor on the stand. ***. And look at [L.D.]. Her demeanor. That was humiliation you saw up there. That was shame for both girls. They weren't walking in here because there was [*sic*] some unmet expectations four years ago and they were still mad about it and they walked in here ***.

And their motive to tell you about that was because it was the truth. As I said [L.D.'s] story has been consistent for four years, consistent. Because when you tell the truth, it's easy to be consistent. It's when you start lying that the devil gets in the detail and you trip yourself up and you confuse yourself and I'll get to that when I get to the defendant's statement. She didn't get tripped up once on the stand. She didn't get tripped up in these past four years.

* * *

*** So to believe that [L.D.] was lying, you would have to believe she made this up from the beginning.

She concocted this in her head, was able to perfectly portray herself as a hysterical person to her cousin. She was perfectly able to get her story straight with the police to match the evidence. And then keep her story straight for four years. Then come in four years later, four years later, her story is still the same."

¶ 50    The State then turned to defense counsel's argument that there was no evidence of abrasions or bruises. The following exchanges then took place.

"They [L.H. and L.D.] never said they were injured. They complied with him. He had a gun. You know the gun he had, ladies and gentlemen, that he had that day this will go back with you as evidence. It has the weight and the feel of a real gun. If you don't know much about guns, you're going to think it's a real gun."

16

Defense counsel then lodged an objection that the State's argument misstated the evidence. The circuit court readmonished the jury to disregard any argument that was not based upon the evidence and that closing arguments were not evidence. The State then argued, "Now we all know that's the gun that [defendant] was carrying with [L.H.] But we also know he is not opposed to carrying guns around when he's walking around on the street. And we all know he's not opposed to using them when he wants to or he needs to."

¶ 51     At the conclusion of closing arguments, the trial court instructed the jury, *inter alia*, that (1) the attorneys make closing arguments to discuss the facts and circumstances in the case, and the arguments should be confined to the evidence and to the reasonable inferences from the evidence; (2) closing arguments are not evidence; and (3) they should disregard any statement or argument not based on the evidence. Following deliberations, the jury found defendant guilty of two counts of aggravated criminal sexual assault and one count of aggravated kidnapping. The court then continued the matter for sentencing.

¶ 52                                        Sentencing

¶ 53     At defendant's sentencing hearing, the State made its arguments in mitigation. The State briefly recounted the facts and noted that, although L.D. was present, she did not wish to provide a victim impact statement. The State also observed that defendant had two prior 2007 burglary convictions (resulting in concurrent three-year sentences of imprisonment), a 2007 conviction of possession of a stolen motor vehicle (24-month sentence of probation that was terminated unsatisfactorily), and a 2009 conviction for possession of a stolen motor vehicle (resulting in seven years' imprisonment). The State asked for a sentence "far above the minimum."

¶ 54     In mitigation, defense counsel argued that defendant was 29 years old, a high school graduate, and the father of five biological children. Counsel added that defendant was taking care

17

of his girlfriend's two other children "as if they were his own" and had a positive employment history. Counsel concluded by asking for a sentence closer to the minimum range.

¶ 55 The circuit court then discussed whether to merge the aggravated kidnapping count into the aggravated criminal sexual assault counts. The State said that its position was that "it doesn't matter" what the predicate offense was for the aggravated kidnapping, so it should not be merged. The court disagreed with the State's argument and indicated that it would merge the aggravated kidnapping count into the aggravated criminal sexual assault counts and sentence defendant solely on those two remaining counts.

¶ 56 Defendant then spoke in allocution. Defendant maintained his innocence and commented that he "aged a lot mentally as well as physically, and I've also lost a lot," including family support.

¶ 57 Following arguments in aggravation and mitigation, the circuit court stated that it reviewed its notes, recalled the facts of the case, reviewed defendant's presentence investigation report (PSI), and considered both arguments of counsel and defendant's allocution. The court noted that defendant had an "extensive" criminal history and that, although defendant had been raised by his grandparents, defendant said he suffered no abuse or neglect during his upbringing. The court further acknowledged that defendant was a high school graduate, had a positive work history, was helping raise his girlfriend's children, and had biological children. The court also recalled that defendant had no mental health, physical health, or substance abuse issues.

¶ 58 Defendant's "issue," according to the court, was "the inability to confine himself within the law to lead a law[-]abiding life and be a productive member of society to any great length here." The court found defendant's "significant" criminal history and the need to deter others as aggravating factors. Although the court stated that it did not find "any specific factor in mitigation that jumps out being applicable in this case," it did nonetheless consider defendant's work history

and the fact that he graduated from high school. Despite defendant's apparent prior involvement in a gang, the court rejected that as an aggravating factor in this case, stating that the PSI seemed to indicate that defendant was no longer involved in a gang. Nevertheless, the court found that, based upon its observations, defendant "simply cannot follow the rules of society in this matter."

¶ 59    After noting that it had also considered the cost of incarceration, the circuit court sentenced defendant to 56 years' imprisonment, comprising two 28-year consecutive terms of imprisonment for each aggravated criminal sexual assault conviction. This appeal follows.

¶ 60                                                ANALYSIS

¶ 61                            The Sufficiency of the Evidence

¶ 62    Defendant first contends that the evidence was insufficient to support his convictions for aggravated criminal sexual assault. Specifically, defendant argues that the State failed to establish that the object in his waistband (that L.D. identified as a gun) was either "used as a bludgeon or that it had any physical characteristics suggesting it could be used" as such. Defendant therefore asks that we reduce his convictions from aggravated criminal sexual assault to criminal sexual assault and remand the cause for resentencing.

¶ 63    When presented with a challenge to the sufficiency of the evidence, this court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. De Filippo*, 235 Ill. 2d 377, 384-85 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The testimony of a single witness, if positive and credible, is sufficient to convict. *People v. Bannister*, 378 Ill. App. 3d 19, 39 (2007) (citing *People v. Smith,* 185 Ill. 2d 532, 541 (1999)), *aff'd*, 236 Ill. 2d 1 (2009). In addition, we may not retry the defendant; instead, the trier of fact must assess the credibility of the witnesses, determine the

appropriate weight of the testimony, and resolve conflicts or inconsistencies in the evidence. *People v. Evans*, 209 Ill. 2d 194, 209, 211 (2004). A jury is not required to accept any possible explanation compatible with a defendant's innocence and elevate it to the status of reasonable doubt. *People v. Herrett*, 137 Ill. 2d 195, 206 (1990). In essence, this court will not reverse a conviction unless the evidence is "so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of defendant's guilt." *Evans*, 209 Ill. 2d at 209.

¶ 64 The State was required to prove that defendant committed criminal sexual assault and that during the commission of the offense, defendant "display[ed], threaten[ed] to use, or use[d] a dangerous weapon, other than a firearm, or any other object fashioned or used in a manner that [led] the victim, under the circumstances, reasonably to believe that the object [was] a dangerous weapon." 720 ILCS 5/11-1.30(a)(1) (West 2012). Defendant does not challenge the evidence underlying the criminal sexual assault allegation; he only argues that the State failed to show that the object defendant possessed was a "bludgeon."

¶ 65 In this case, however, L.D. testified that defendant lifted his shirt and showed that he had a gun in his waistband. L.D. unequivocally testified that it was a gun because she knew what guns look like. Although L.D. was the sole witness to offer this testimony, it was positive and credible, and therefore sufficient to convict. See *Bannister*, 378 Ill. App. 3d at 39. Shortly thereafter, defendant ordered L.D. to "suck his dick" and that "if she valued her life" she would suck it like she wanted to live. After the assault, defendant then threatened to "come after" L.D., her infant son, and L.D.'s "family" if she told anyone what happened. On these facts, it was a reasonable inference for the jury to conclude that defendant either displayed or threatened to use a dangerous weapon, or some other object that led L.D. to reasonably believe that it was a dangerous weapon.

Since the evidence is not "so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of defendant's guilt" (*Evans*, 209 Ill. 2d at 209), we may not reverse defendant's conviction.

¶ 66    We further reject defendant's reliance upon *People v. Ross*, 229 Ill. 2d 255 (2008), and *People v. Thorne*, 352 Ill. App. 3d 1062 (2004).  In those cases, the defendants were charged with armed robbery under a since-amended statute that required the State to prove that the defendants' firearms were also "dangerous weapons."  See *Ross*, 229 Ill. 2d at 272; *Thorne*, 352 Ill. App. 3d at 1072.  In both cases, the victims testified that the defendant pointed a gun at them during the commission of the robbery, but in fact police recovered a BB gun.  *Ross*, 229 Ill. 2d at 258; *Thorne*, 352 Ill. App. 3d at 1064.  Both reviewing courts reduced the convictions to simply robbery because there was no evidence that the BB guns were dangerous weapons.  *Ross*, 229 Ill. 2d at 276-77; *Thorne*, 352 Ill. App. 3d at 1073-74.

¶ 67    Here, the prior version of the armed robbery statute is not at issue.  Moreover, although the weapon used in the prior assault on L.H. was a replica "BB" gun that was both recovered and submitted to the jury, the object in defendant's waistband was never recovered.  We are thus left with L.D.'s unequivocal testimony that it was a gun based upon her view of the weapon and her knowledge of guns.  This testimony has been repeatedly held to be sufficient to support a trier of fact's inference that a defendant possessed a gun.  See *People v. McLaurin*, 2020 IL 124563, ¶ 36 (holding that the officer's testimony that she saw the defendant holding a firearm and her familiarity with firearms were sufficient to support a finding that the defendant possessed a firearm); *People v. Wright*, 2017 IL 119561, ¶¶ 76-77; *People v. Washington*, 2012 IL 107993, ¶¶ 34-37; see also *People v. Davis*, 2020 IL App (2d) 180470-U, ¶ 52 (holding that a rational trier of fact could infer that the defendant possessed a firearm based upon the victim's "unequivocal[]" testimony, the victim's view of the gun, and the victim's prior knowledge of that

21

type of gun's appearance) (citing *McLaurin*, 2020 IL 124563, ¶ 35). Defendant's reliance upon *Ross* and *Thorne* are therefore unavailing.

¶ 68                              The Admission of the Replica Gun Into Evidence

¶ 69    Defendant next contends that the circuit court erred in allowing into evidence the replica gun, which was used in the sexual assault of L.H. but not L.D. Defendant argues that the replica gun had been confiscated by police months before L.D.'s assault, so its admission into evidence was irrelevant. Defendant acknowledges that L.D. was never asked to identify the replica gun as the item possessed by her assailant, but he nonetheless argues that the admission of this evidence prejudiced him because it was misleading and the State improperly relied upon it to argue that the jury could find that he possessed a dangerous weapon at the time of L.D.'s assault. Defendant asks that we reverse his convictions and remand for a new trial. Defendant concedes that none of these claims were raised at trial or in a post-trial motion and are therefore forfeited. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant, however, asks that we review this issue under the plain error doctrine, or alternatively, asserts that trial counsel rendered ineffective assistance.

¶ 70    The plain error rule bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either: (1) the evidence is close, regardless of the seriousness of the error; or (2) the error is serious, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 185-87 (2005). In the first instance, the defendant must prove "prejudicial error." *Id.* at 187. By contrast, in the second instance, prejudice to the defendant is presumed because of the importance of the right involved, regardless of the strength of the evidence. *Id.* In the latter situation, the defendant must prove that "there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial

process." *Id.* However, before considering whether the plain-error exception applies, we must first determine whether any error occurred. *Id.*

¶ 71 Claims of ineffective assistance of counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by the supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984). *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010). To establish ineffective assistance, a defendant must show both that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant. *Id.* (citing *Strickland*, 466 U.S. at 687). Deficient performance is performance that is objectively unreasonable under prevailing professional norms, and prejudice is found where there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 496-97; *Strickland*, 466 U.S. at 690, 694. The failure to establish either prong of the *Strickland* test is fatal to the claim. *People v. Clendenin*, 238 Ill. 2d 302, 317-18 (2010) (citing *Strickland*, 466 U.S. at 697).

¶ 72 All relevant evidence is admissible unless otherwise provided by law, where "relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. Rs. Evid. 401, 402 (eff. Jan. 1, 2011). In addition, with certain exceptions, evidence of other crimes or acts is not admissible to "prove the character of a person in order to show action in conformity therewith." Ill. R. Evid.404(b) (eff. Jan. 1, 2011). Such evidence, however, may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *People v. Pikes*, 2013 IL 115171, ¶ 14. In addition, section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) provides another exception to the bar against the use of other-crimes evidence to show propensity in cases, where,

23

as here, a defendant is accused of aggravated criminal sexual assault. 725 ILCS 5/115-7.3 (West 2014). This includes evidence "to rebut that proof [*i.e.*, the commission of that prior crime,] or an inference from that proof." *Id.* We review the circuit court's decision to admit evidence for an abuse of discretion. *People v. Lerma*, 2016 IL 118496, ¶ 23. An abuse of discretion occurs "only where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks removed.) *Id.*

¶ 73     In this case, the State first proffered the prior sexual assault of L.H. to show propensity, among other things. In addition, the State sought admission of the replica gun used in L.H.'s assault as other crimes evidence. The State explained that the gun used in L.H.'s assault would show the circumstances of defendant's arrest, his proximity to the time and place of L.H.'s assault, and identification of the weapon used in the assault. In that prior offense, defendant used a replica gun to coerce L.H. to perform various sex acts with defendant. Defense counsel, however, attacked L.H.'s credibility and posited that it was a consensual encounter between her and defendant. Counsel recounted L.H.'s testimony that, after the purported assault, defendant "sat her on the stairs and had pillow talk for an hour," then took her to defendant's family's house (where there were three other adults present), arranged some pillows on the floor, and "then they spoon all night." Questioning the veracity of L.H.'s claim, defendant further told the jury, "That's no rape I've ever heard of." In light of these circumstances, the replica gun was relevant to explain the circumstances of defendant's arrest, identify defendant, and corroborate L.H.'s testimony that defendant sexually assaulted her. As such, we cannot hold that the circuit court's decision to admit the replica gun into evidence was " 'arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it' " (*id.*), so the court did not abuse its discretion.

¶ 74   We acknowledge that the replica gun (that was used only in L.H.'s assault) was submitted to the jury but the State erroneously implied in its rebuttal argument that the gun defendant had "that day" would be submitted to the jury as evidence.  This erroneous comment occurred after— and in the context of—the State's response to defense counsel's argument that both victims had no bruises or abrasions:  the State explained that the two women had no injuries because they complied with defendant's demands at gunpoint.  In any event, defense counsel immediately objected, and after the circuit court readmonished the jury to disregard any closing argument not based upon the evidence or a reasonable inference therefrom, the State promptly clarified that the recovered weapon was "the gun that [defendant] was carrying with [L.H.]"

¶ 75   The State's clarification that the recovered weapon was only used in L.H.'s assault does not seem to indicate that the State was relying upon it to prove that the recovered weapon was also used in L.D.'s assault.  Finally, the State's subsequent argument that the jury could infer that defendant was "not opposed to carrying guns around when he's walking around on the street" was a reasonable inference from the evidence, which is proper.  Therefore, since there was no error, plain error review is not warranted, and we must honor defendant's procedural default.  *Herron*, 215 Ill. 2d at 187.

¶ 76   Finally, we reject defendant's claim of ineffective assistance of counsel.  Counsel's failure to object to the admission of the gun was not objectively unreasonable (see *People v. Williams*, 147 Ill. 2d 173, 238-39 (1991) ("defense counsel is not required to undertake fruitless efforts to demonstrate his effectiveness")), and given the facts of this case, there is no reasonable probability that the verdict would have been different had counsel lodged an objection.  Defendant's ineffective assistance of counsel claim thus fails both prongs of *Strickland.*  Accordingly, we must reject defendant's claim of error on this point.

25

¶ 77                         Evidence of a Prior Sexual Offense

¶ 78    Defendant next contends that the trial court erred in allowing the State to introduce other crimes evidence to show his propensity to commit sexual assaults, namely, L.H.'s testimony that defendant sexually assaulted her two months' prior to the offense here.  Defendant argues that (1) the similarities of the assault involving L.H. and this case were general and common to all sex offenses and (2) the "gross differences" between the two incidents resulted in the prejudicial effect of this prior incident outweighing its probative value.  Defendant seeks a new trial because this alleged erroneous admission was not harmless beyond a reasonable doubt and the evidence in this case was not overwhelming.

¶ 79    Section 115-7.3 of the Code provides an exception to the common law bar against the use of other-crimes evidence to show propensity in cases, where, as here, a defendant is accused of criminal sexual assault.  725 ILCS 5/115-7.3 (West 2012).  Under this section, evidence of another criminal sexual assault "may be admissible * * * and may be considered for its bearing on any matter to which it is relevant."  725 ILCS 5/115-7.3(b) (West 2012).  Relevant matters include allowing evidence of other crimes to show a defendant's propensity to commit sex offenses. *People v. Donoho*, 204 Ill. 2d 159, 176 (2003).  Where the other-crimes evidence meets the threshold statutory requirement of relevance and contains probative value, it is presumed to be admissible if its probative value is not substantially outweighed by its prejudicial effect. *Id.* at 182-83.  The statute provides the trial court may consider the following factors in conducting this balancing test:  (1) the proximity in time to the charged offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) "other relevant facts and circumstances."  725 ILCS 5/115-7.3(c) (West 2012).  It should be noted, however, that with respect to the degree of factual

similarity, there need only be a "threshold similarity," and even "mere general areas of similarity will suffice," because "no two independent crimes are identical." *Donoho*, 204 Ill. 2d at 184-85.

¶ 80 We will not reverse the circuit court's decision to admit other-crimes evidence absent an abuse of discretion. *Id.* at 182. As noted above, an abuse of discretion is found only when the court's decision is "arbitrary, fanciful or unreasonable or where no reasonable man would take the view adopted by the trial court." (Internal quotation marks omitted.) *Id.*

¶ 81 Here, the first factor weighs in favor of the State because both crimes were in close proximity in time: L.H.'s assault was a scant two months prior to L.D.'s. The second factor also weighs heavily in favor of the State. In both instances: (1) the victim was an African-American female in her 20's, (2) the victim was walking down the street when defendant approached and displayed what appeared to be a handgun, (3) defendant forced the victim to an isolated area and forced her to remove her clothing before assaulting her at gunpoint, (4) defendant vaginally penetrated the victim, (5) the victim did not know defendant, and (6) the assault occurred in the same neighborhood and within close proximity to the other assault. Although there were factual differences between the two assaults, they need not be identical for the other crime to be admitted. In this case, the two assaults easily meet the "threshold" or "general areas" of similarity that would allow for their admission into evidence. *Donoho*, 204 Ill. 2d at 184-85.

¶ 82 Turning to the third factor, "other facts and circumstances," we note that one of the purposes of section 115-7.3 is to promote the "effective prosecution of sex offenses and strengthen[] evidence in sexual abuse cases." *Id.* at 178. In particular, the *Donoho* court observed that the legislation was unique to sex offenders, who have a "propensity *** to repeat their crimes." *Id.* at 173-74 (quoting 90th Ill. Gen. Assem., Senate Proceedings, March 19, 1997, at 56–57 (statements of Senator Radogno)). Since defendant testified at trial that both encounters with L.H.

and L.D. were consensual acts, the evidence of L.H.'s assault strengthened the evidence that defendant similarly assaulted L.D. This factor thus weighs in favor of admitting this evidence.

¶ 83 Finally, the probative value of L.H.'s assault was not *substantially* outweighed by the prejudicial effect. Despite certain factual differences between the two assaults, their temporal (and geographic) proximity as well as the other material factual similarities provide far greater probative value than prejudicial effect. Since the circuit court's determination was not arbitrary, fanciful, unreasonable, or one where no reasonable person would take the view adopted by the court, it did not abuse its discretion. Defendant's contention therefore fails.

¶ 84                              Defendant's Right to a Speedy Trial

¶ 85 Next, defendant contends that he was denied his right to a speedy trial. He argues that the amendment to the information was a substantive change made after 120 days had passed from the date of his original charge, and since new charges were filed, no delay could be attributed to him on the new charge. He concludes that the prosecution of the new charge violated his speedy trial guarantees, so we must vacate his convictions. Defendant again states that trial counsel did not object either at trial or in a post-trial motion, thus forfeiting the issue on appeal. See *Enoch*, 122 Ill. 2d at 186. Defendant, however, argues that we should review this claim because trial counsel was ineffective for failing to seek discharge.

¶ 86 A criminal defendant has both a constitutional and a statutory right to a speedy trial. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; 725 ILCS 5/103-5(a) (West 2014). Although the Illinois speedy trial statutes implement the constitutional right, the statutory and constitutional rights are not coextensive. *People v. Phipps*, 238 Ill. 2d 54, 65 (2010). Defendant does not raise a constitutional issue; he only contends his statutory right to a speedy trial was violated.

28

¶ 87    Section 103-5 of the Code provides that every person in custody for an alleged offense shall be tried within 120 days from the date he was taken into custody unless "delay is occasioned by the defendant." 725 ILCS 5/103-5(a) (West 2012).  Nonetheless, even if a delay is attributable to a defendant on the original charges, that delay is not always attributable to the defendant on subsequently filed charges. *Phipps*, 238 Ill. 2d at 66.  If new and additional charges arise from the same facts as the original charges, and the State knew these facts when it began its prosecution, prior continuances from the original charges are not attributed to defendants with respect to the new and additional charges because the new and additional charges were not before the court when those continuances were obtained. *Id.*  This rule, however, only applies when the original and new charges are subject to compulsory joinder. *Id.* at 67.  The purpose of the rule is to prevent " 'trial by ambush,' " where the State lulls the defendant into agreeing to pretrial delays on certain charges while it prepares for trial on more serious—but not pending—charges. *Id.*  We review *de novo* whether subsequent charges are new and additional. *Id.*

¶ 88    Section 111-5 of the Code allows for the amendment of an information at any time to correct formal defects, such as a miswriting. 725 ILCS 5/111-5 (West 2012).  Moreover, the list of formal defects in section 111-5 is not exclusive. *People v. Milton*, 309 Ill. App. 3d 863, 866 (1999) (citing *People v. Benitez*, 169 Ill. 2d 245, 255 (1996)).  A formal amendment is warranted if the defendant is not surprised or prejudiced or if the record shows he was otherwise made aware of the actual charge. *Id.*  Formal amendments do not implicate speedy trial concerns. *Id.*  We review the circuit court's decision to allow an amendment to a charging instrument for an abuse of discretion. *People v. Alston*, 302 Ill. App. 3d 207, 211 (1999).

¶ 89    The State originally charged defendant with aggravated criminal sexual assault based upon the use or threat to use a dangerous weapon, "to wit:  a firearm."  Before trial, the State sought

leave to amend the information, replacing the word "firearm" with "bludgeon." Defendant agreed to this change, and the circuit court allowed the amendment. Although the information in the common law record also indicates a handwritten change of the statutory subsection from "11-130(a)(1)" to "11-130(a)(3)," the transcript indicates that no such change was discussed. Where there is a conflict in the record between the report of proceedings and the common law record, the report of proceedings controls. *People v. Martinez*, 361 Ill. App. 3d 424, 427 (2005). We shall thus view the change to the information to be only the change of the term "firearm" to "bludgeon," rather than the change to the statutory section.

¶ 90    Defendant argues that the change in the term following "to wit" constituted a new and additional charge. The substantive allegations in both counts, however, remained the same: defendant sexually assaulted L.D. while armed with a dangerous weapon. Instead of alleging that defendant brandished a firearm, the change alleged that defendant brandished a bludgeon. Aggravated criminal sexual assault requires proof of the following elements: (1) commission of criminal sexual assault and (2) the display, threatened use, or use of a dangerous weapon (other than a firearm). *People v. Leach*, 385 Ill. App. 3d 215, 220 (2008). Since the original information and the amendment both alleged identical conduct and have the same elements and penalty, the amended information did not allege a new and additional charge, and consequently speedy-trial concerns do not arise. See *People v. Staake*, 2017 IL 121755, ¶¶ 39-40 (citing *Phipps* 238 Ill. 2d at 68, 70); *Milton*, 309 Ill. App. 3d at 866.

¶ 91    Defendant acknowledged forfeiture of this issue but asserted that review was nonetheless warranted because trial counsel was ineffective. To establish ineffective assistance, a defendant must show both that deficient performance and prejudice. *Petrenko*, 237 Ill. 2d at 496 (citing *Strickland*, 466 U.S. at 687). Since there is no lawful basis for raising a speedy-trial objection,

counsel's failure to assert a speedy-trial violation fails *both* prongs of an ineffective assistance claim. *Phipps*, 238 Ill. 2d at 65. Defendant's contention of error is without merit.

¶ 92                                    The State's Closing Argument

¶ 93     Defendant first contends that he was denied a fair trial based upon the State's misconduct during closing arguments. Specifically, defendant argues that the following comments that the State made were not supported by the evidence: (1) the State's argument in rebuttal that L.D.'s and L.H.'s statements about the attacks were consistent for four years, and (2) the State's argument in its initial closing argument that defendant used the word "strip" with L.H. Defendant acknowledges that none of these claims were raised at trial or in a post-trial motion and are thus forfeited. See *Enoch*, 122 Ill. 2d at 186. Defendant, however, again asks that we consider this issue as either plain error, or alternatively, ineffective assistance of counsel.

¶ 94     The State is given considerable latitude in making closing arguments, and it may respond to comments that clearly invite a response. *People v. Hall*, 194 Ill. 2d 305, 346 (2000). Furthermore, we must review the arguments of both the State and the defense in their entirety, with the challenged portions placed in their proper context. *People v. Cisewski*, 118 Ill. 2d 163, 175-76 (1987). A significant factor in determining the impact of an improper comment on a jury verdict is whether "the comments were brief and isolated in the context of lengthy closing arguments." *People v. Runge*, 234 Ill. 2d 68, 142 (2009). In addition, we must presume, absent a showing to the contrary, that the jury followed the trial judge's instructions in reaching a verdict. *People v. Simms*, 192 Ill. 2d 348, 373 (2000). Finally, even if the State's closing remarks are improper, "they do not constitute reversible error unless they result in substantial prejudice to the defendant such that absent those remarks the verdict would have been different." *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). Consistent with these holdings, our supreme court has

recently clarified the appropriate standard of review on these issues: there is reversible error *only* if defendant demonstrates that (1) the remarks were improper and (2) they were "so prejudicial that real justice was denied or the verdict resulted from the error." *People v. Jackson*, 2020 IL 124112, ¶ 83 (citing *Runge*, 234 Ill. 2d at 142).

¶ 95    In this case, defendant first argues that the State improperly argued in rebuttal that both L.H.'s and L.D.'s statements regarding their attacks were consistent for four years. Defendant challenged the credibility of both witnesses in his closing argument. With respect to L.D., counsel argued that L.D. had to have known defendant since they both lived in the same area it was not credible that, despite the fact that they both "have been living in this area all this time, *** Englewood," L.D. stated that she did not know defendant and had never seen him before, until a few days after the assault. As to L.H., defense counsel pointed out in his closing argument that, although at trial she denied telling either detectives or defense counsel and the defense investigator that defendant had initially offered to help her recover her phone, there were two stipulations that she told both Detective Hopps precisely that, and then "four years later," she made the same statement to the defense investigator, which contradicted her testimony. Reading the closing arguments in context, as we must (see *Cisewski*, 118 Ill. 2d at 175-76), the State was arguing to the jury that, unlike defendant's testimony, the testimony of L.H. and L.D. was not riddled with contradictions. Since the State may respond to comments that clearly invite a response (*Hall*, 194 Ill. at 346), defendant's claim of error on this point is unavailing.

¶ 96    With respect to its use of the word "strip," and again reading the closing argument in context (*Cisewski*, 118 Ill. 2d at 175-76), the central theme of the State's argument was that defendant ordered his victims to remove their clothing in both assaults; it was not that defendant

used the word "strip" or any other particular term. The State's comment was therefore a proper inference from the evidence.

¶ 97    In any event, we note that the circuit court instructed the jury to disregard any argument that was not based upon the evidence (or a reasonable inference therefrom), and defendant does not argue that the jury failed to follow the court's instructions. This weighs against defendant's claim. See *Simms*, 192 Ill. 2d at 373. We further observe that these comments were isolated within the State's closing arguments that aggregate nearly 30 pages of text. This further weakens defendant's contention of error. See *Runge*, 234 Ill. 2d at 142. Since the remarks were neither improper nor were they so prejudicial that real justice was denied or the verdict resulted from the error, there was no reversible error. See *Jackson*, 2020 IL 124112, ¶ 83

¶ 98    Finally, defendant argues in passing that the cumulative impact of these purported errors warrants a new trial. This argument, however, is unavailing because we have rejected each claimed error. See *People v. Perry*, 224 Ill. 2d 312, 356 (2007).

¶ 99    Moreover, even assuming, *arguendo*, that the State committed error, defendant's claim would fail under both the plain error doctrine and as an ineffective assistance of counsel claim. To begin, the first prong of the plain error doctrine does not apply because, contrary to defendant's assertion, the evidence was not close. Defendant's conviction was supported by not only L.D.'s testimony, but also numerous other witnesses, including L.H., a propensity witness. Thus, the first prong of the plain error doctrine is inapplicable.

¶ 100   Furthermore, the second prong of the plain error doctrine does not arise here because we do not consider the alleged errors in this case to be so serious that they "affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Herron*, 215 Ill. 2d at 187. The circuit court's jury instructions included the following: (1) the jury was to base its

verdict only on the evidence (and reasonable inferences therefrom); (2) closing arguments are not evidence; and (3) the State has the burden to prove defendant guilty. Defendant provides nothing to rebut the presumption that the jury followed the judge's instructions. See *Simms*, 192 Ill. 2d at 373. In addition, as noted above, the remarks that defendant challenges were isolated within lengthy closing arguments, which weighs significantly in favor of the State. See *Runge*, 234 Ill. 2d at 142. The second prong of the plain error doctrine is therefore inapplicable. See *People v. Glasper*, 234 Ill. 2d 173, 215 (2009) ("Even though the remark was improper, we do not find that the error was so serious that the second prong of the plain-error test is satisfied.").

¶ 101   Defendant's claim of ineffective assistance of counsel also fails. In this case, defendant cannot show prejudice. As already discussed, there was substantial evidence supporting defendant's guilty verdict. Thus, even if defense counsel had objected to the State's remarks, there is no reasonable probability that the result of the proceeding would have been different. *Petrenko*, 237 Ill. 2d at 496-97; *Strickland*, 466 U.S. at 690, 694. Since defendant cannot establish both prongs of the *Strickland* test, his claim necessarily fails. *Clendenin*, 238 Ill. 2d at 317-18 (citing *Strickland*, 466 U.S. at 697).

¶ 102                                     Defendant's Sentence

¶ 103   Defendant last contention is that his sentence is excessive. Specifically, he argues that the circuit court's findings "primarily consisted of [defendant's] status as a recidivist and failed to take into account mitigating factors such as his lack of any violent prior convictions, his employment history, his high school diploma, and his close ties with his family." Defendant asks that we either reduce the sentence or remand for resentencing. Defendant concedes that trial counsel did not file a motion to reconsider sentence, resulting in forfeiture of this issue. See *People v. Hillier*, 237 Ill.

2d 539, 544 (2010). Defendant, nonetheless, again seeks refuge under either the plain error doctrine, or alternatively, a claim of ineffective assistance of counsel.

¶ 104   In imposing a sentence, the trial court must balance relevant factors, such as the nature of the offense, the protection of the public, and the defendant's rehabilitative potential. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). The trial court has a superior opportunity to evaluate and weigh a defendant's credibility, demeanor, character, mental capacity, social environment, and habits. *Id.* In addition, a trial court is not required to expressly outline its reasoning for sentencing, and absent some affirmative indication to the contrary (other than the sentence itself), we must presume that the court considered all mitigating factors on the record. *People v. Perkins*, 408 Ill. App. 3d 752, 762-63 (2011). Since the most important sentencing factor is the seriousness of the offense, the court is not required to give greater weight to mitigating factors than to the seriousness of the offense, and the presence of mitigating factors neither requires a minimum sentence nor precludes a maximum sentence. *Alexander*, 239 Ill. 2d at 214.

¶ 105   A sentence within statutory limits is reviewed for an abuse of discretion, and we may only alter such a sentence when it varies greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Id.* at 212. So long as the trial court does not ignore pertinent mitigating factors or consider either incompetent evidence or improper aggravating factors, it has wide latitude in sentencing a defendant to any term within the applicable statutory range. *Perkins*, 408 Ill. App. 3d at 762-63. This broad latitude means that this court cannot substitute its judgment simply because it might have weighed the sentencing factors differently. *Alexander*, 239 Ill. 2d at 212-13.

¶ 106   In this case, the trial court did not abuse its discretion. Defendant was convicted of aggravated criminal sexual assault while displaying a bludgeon, a Class X felony for which ten

years must be added on to the sentence. 720 ILCS 5/11-1.30(d)(1) (West 2016) (aggravated criminal sexual assault is a Class X felony with a 10-year add-on for offenses committed while displaying a dangerous weapon other than a firearm); 730 ILCS 5/5-4.5-25(a) (West 2016) (6- to 30-year sentencing range for Class X felonies). In addition, the court was required by statute to impose consecutive sentences for defendant's two aggravated criminal sexual assault convictions. 730 ILCS 5/5-8-4(d)(2) (West 2012). The aggregate sentencing range for defendant's two convictions is therefore from 32 to 80 years' imprisonment. Since defendant's 56-year sentence falls precisely at the midpoint of the sentencing range, we may only disturb the sentence if it varies greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Alexander*, 239 Ill. 2d at 212. Neither exception applies in this case.

¶ 107   Here, contrary to defendant's claim, the circuit court's findings did not "primarily" consist of defendant's status as a recidivist. Although the court did note defendant's "extensive" criminal history, it also noted that defendant was raised by his grandparents (who neither abused nor neglected him), was a high school graduate, had a positive work history, was helping raise his girlfriend's children, and had biological children. The court also recalled that defendant had no mental health, physical health, or substance abuse issues. The court found defendant's "significant" criminal history—including four felony conviction with increasing prison terms— and the need to deter others as aggravating factors. The court, however, rejected defendant's apparent prior involvement in a gang as an aggravating factor, taking as true defendant's statement in the PSI that he was "no longer" associated with a gang. Despite the fact that the court did not find any factors in mitigation, it did nonetheless consider defendant's work history and the fact that he graduated from high school. The court even took into account the cost of incarcerating

defendant, which would likely favor a lesser sentence.  On these facts, the sentence does not vary greatly from the spirit and purpose of the law.  This exception is therefore inapplicable.

¶ 108   Moreover, the facts of this case are that defendant took L.D. at gunpoint to an abandoned building, forced her to perform oral sex on her if she valued her life, vaginally penetrated her, and then ejaculated on her buttocks.  After the assault, defendant looked through L.D.'s phone and then threatened her life as well as those of her infant son and the son's father if she reported the crime.  In addition, there was evidence that defendant had raped L.H. only three months prior to this offense.  The sentence is thus not manifestly disproportionate to the nature of this offense.

¶ 109   Defendant, however, supports his contention by noting that "outside of" the sexual assault, defendant did not cause any additional physical harm to L.D.  Defendant further states that the offense was brief, and he neither used nor brandished the weapon during the offense—as defendant emphasizes, "Indeed, there was no evidence that [defendant] removed the item from his waistband during the entirety of the offense."  In effect, defendant argues that he is entitled to a reduced sentence because he "only" raped L.D.  That argument is as offensive as it is unpersuasive.

¶ 110   Finally, defendant supports his claim by noting that his sentence is over three times the State's pretrial offer of 17 years for both counts.  This argument is meritless.  It is well established that the mere fact that a defendant received a greater sentence than a pretrial offer during the plea bargaining process does not, *per se*, support an inference that the greater sentence reflected "punishment for demanding trial."  See *People v. Jones-Beard*, 2019 IL App (1st) 162005, ¶ 26 (quoting *People v. Carroll*, 260 Ill. App. 3d 319, 348-49 (1992)).  Rather, it must be "clearly evident" in the record that the harsher sentence resulted from a trial demand, such as when the circuit court makes explicit remarks concerning the harsher sentence (*People v. Ward*, 113 Ill. 2d 516, 526 (1986)), or where the actual sentence is shockingly higher than the pretrial offer (see,

*e.g.*, *People v. Dennis*, 28 Ill. App. 3d 74, 78 (1975) (sentence 20 times greater than pretrial offer held to be punishment for the defendant's decision to reject offer and proceed to trial)). Defendant has provided nothing other than the sentence and his bald assertion that a sentence that is just over three times the pretrial offer is *ipso facto* excessive. Our precedents disagree. See *Carroll*, 260 Ill. App. 3d at 349 (sentence that was "only" 2.5 times the pretrial offer "clearly *** does not approach the excessive nature of the sentence deemed an improper punishment in *Dennis*").

¶ 111   Although defendant forfeited this issue, he argued that review was warranted as either plain error or ineffective assistance of counsel. The plain error doctrine does not apply; as noted throughout, where there is no error, there is no plain error. See *Herron*, 215 Ill. 2d at 187. In addition, counsel is not ineffective for failing to file a fruitless motion. See *Williams*, 147 Ill. 2d at 238-39. Defendant's final contention of error is therefore unavailing.

¶ 112                                      CONCLUSION

¶ 113   We affirm defendant's conviction and sentence.

¶ 114   Affirmed.